**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THOMAS WATERS, JR                 *
                                  *
        Plaintiff,                *
                                  *        Civil Action No: 06-383 (RBW)
        v.                        *
                                  *
CENTRAL INTELLIGENCE AGENCY       *
                                  *
        Defendant.                *
*    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION**
**OR, ALTERNATIVELY, FOR PRELIMINARY INJUNCTION**

Plaintiff Thomas Waters, Jr., ("Waters") filed the underlying action on March 3, 2006, to challenge the defendant Central Intelligence Agency's ("CIA") unconstitutional and unlawful action to block publication of significant portions of his 376 page book *Class 11: Inside the CIA's First Post-9/11 Spy Class* (Dutton: 2006). The book is scheduled for publication on April 6, 2006. The CIA's Prepublication Review Board ("PRB"), although having officially approved a version of the manuscript in 2004 for release as unclassified, now claims that portions of text on nearly 200 pages are classified. The CIA has threatened to pursue all available legal remedies, which would include both criminal and civil penalties, against Waters should he allow publication of the book to occur without its final approval (of course, Dutton could seek to publish the book at anytime it desires unless the CIA obtains an injunction against it).

Waters fully cooperated with the CIA during the entire nearly two-year period he was seeking CIA review and reasonably believed that all CIA concerns had been met. The CIA delayed issuing its decisions, which were inconsistent with prior determinations, way beyond the required deadlines imposed upon it by policy and law. Despite knowing

that the manuscript had been sold to Dutton in December 2004, and that the book was scheduled for March/April 2006 publication, at the last minute the CIA reclassified significant portions of the book. If these issues cannot be resolved prior to March 10, 2006, the April 6, 2006, publication date will be lost and the release of the book will be delayed for weeks or possibly even months. Additionally, Waters will incur expenses, the exact amount which is unknown but it will total more than $9,000, due to the delays caused by, and the continuing obstruction from, the CIA.

Therefore, Waters seeks this preliminary injunction or permanent injunction to prevent the continuing violations of his First Amendment rights.[1] This Court should grant Waters' Motion because:

a.  it is a justiciable issue before this court in that the CIA's decisions violates the U.S. Constitution, federal law, Presidential Executive Orders and CIA's own regulations.

b.  there is an actual and/or substantial likelihood Waters will succeed on the merits of his case because there is no dispute that the CIA's PRB had previously determined that portions of the manuscript now allegedly at issue were approved for dissemination as unclassified and did not need to be resubmitted for review, and the more recent modifications were all supported by publicly available source information or previously approved information (including nothing more than grammatical and other types of corrections made by the publisher), and therefore are unclassified;

c.  Waters' faces irreparable injury by the CIA's infringement of his sacred First Amendment rights, as well as significant financial harm and possible criminal and civil penalties;

---

[1] Waters has contemporaneously requested a hearing on this matter, pursuant to LCvR 65.1, and filed the appropriate statement of the facts which make expedition essential.

2

d.  public interest will be furthered by granting the injunction because the public has

an interest in ensuring that the constitutional rights, particularly those covered by the First

Amendment which serves as the foundation of our nation's creation, are protected from

abuse, and in requiring federal agencies such as the CIA to abide by all regulatory and

statutory obligations.

## FACTUAL BACKGROUND

Waters was employed by the CIA from 2002-2004. Due to his employment, he is

required by virtue of a secrecy agreement to submit all writings for prepublication

review. He is currently a senior intelligence contract analyst for the Department of

Defense. See Complaint at ¶3 (filed March 3, 2006); Declaration of Thomas J. Waters at

¶3 (dated March 6, 2006)("Waters Decl."), attached at Exhibit "1".

Waters participated in the first CIA training class that followed the tragic terrorist

attacks of September 11, 2001. The CIA had received more than 150,000 resumes from

interested individuals, and more than 100 students, to include Waters, were accepted. He

entered on duty on July 15, 2002, as a member of Class 11 in the Directorate of

Operations. Due to unrelated personal reasons, he left the CIA on March 5, 2004.

Complaint at ¶5; Waters Decl. at ¶3.

By letter dated May 27, 2004, Waters submitted a draft non-fiction manuscript then

entitled *Class 11: America Responds to September 11* to the CIA's PRB for

prepublication review. See Exhibit "2"; Waters Decl. at ¶3. The PRB is required by

internal regulation and judicial rulings to issue decisions regarding submissions within

thirty days of receipt of the document. Complaint at ¶6.

By letter dated September 1, 2004, the CIA's PRB responded, through its then Chairman, Paul Noel Chretien, J.D., with an eight page letter detailing the information which had been determined to be "inappropriate for disclosure in the public domain and must be revised or deleted prior to publication." Other than those portions specifically identified as "inappropriate", all other portions of the manuscript were officially approved for release by the CIA as unclassified. As a result, Waters was legally able to disseminate the draft manuscript so long as the CIA's identified redactions or changes were made. Complaint at ¶7; Exhibits "3", "3a".

Following several phone conversations between Waters and the PRB, by letter dated September 16, 2004, which was delivered via facsimile, Waters resubmitted his manuscript for further pre-publication review.[2] He noted that "[a]ll of the sections outlined in your memo were dropped or changed prior to sending the manuscript to a literary agency for review." Additionally, Waters provided modified language pursuant to his telephone conversations in order to meet all CIA concerns, as well as requested

---

[2] All of Waters' substantive personal correspondence with the PRB is being submitted under seal (a Motion to Seal Certain Exhibits is being filed contemporaneously) for the precautionary purpose of ensuring no classified information is contained therein (though none is reasonably suspected), as well as to protect any proprietary information relating to the book. The PRB was notified by Waters' counsel of the impending nature of this litigation and Motion on March 2, 2006. A copy of the Complaint was delivered as a courtesy to the PRB on March 3, 2006. On March 4, 2006, the PRB was specifically advised that Waters intended to file his correspondence with the Court as part of this Motion and invited the PRB to specifically comment, having never done so before, as to any concerns it held with respect to the contents of Waters' correspondence. Finally, on March 6, 2006, the PRB was advised that a short delay in the filing of this Motion would provide them additional time to respond, if it so desired. At the time of the filing of this Motion, no response had been received from the CIA/PRB. Should the CIA not address in its forthcoming response the classification status of these communications, Waters will request that this Court unseal the relevant exhibits (except for those where proprietary concerns remain).

reconsideration of several redactions due to his providing of public source information that served as the basis for his writing. Complaint at ¶8; Waters Decl. at ¶3; Exhibit "4".

By e-mail dated September 17, 2004, the PRB acknowledged receipt of the modified manuscript and informed Waters that it "will expedite our review." Complaint at ¶9; Exhibit "5". By letter dated September 20, 2004, the PRB notified Waters that it had "completed its review of the rewrite of your manuscript entitled *Class 11 – America Responds to 9-11: Inside the Largest Spy Class in CIA History*." Only four words in the entire manuscript were determined to be "inappropriate for disclosure in the public domain and must be revised or deleted prior to publication." The PRB noted that if "you can rewrite these sections, as you did previous sections where the identity of your cover provider was changed, the Board will reconsider its objections." Other than these four words, the entire manuscript had now been officially determined by the CIA to be unclassified and Waters was free to disseminate or publish it as he saw fit. In closing, the PRB notified Waters that "[a]fter making the changes the Board requires, you must resubmit the manuscript for final Agency review. In lieu of resubmitting the entire manuscript, you may return only the affected pages or you may verify in writing that you have made all the deletions and revisions." Complaint at ¶10; Exhibits "6", "6a".

By letter dated September 20, 2004, Waters responded to the PRB and agreed to rewrite the four words. Complaint at ¶11; Waters Decl. at ¶3; Exhibit "7". By letter dated December 5, 2004, Waters sent additional modifications via facsimile and e-mail that he had made to the manuscript to include new sections and slight changes to previously cleared text. He also submitted Powerpoint file images for review. With his materials he provided public source references to support the unclassified nature of the text

modifications. Additionally, so that the PRB was not required to review previously approved text, Waters highlighted the proposed changes in color and in pen. Complaint at ¶12; Waters Decl. at ¶3; Exhibit "8".

By e-mail dated December 6, 2004, the PRB acknowledged receipt of the fax and e-mail attachments and stated it "will begin our review." Complaint at ¶13; Exhibit "9". In or around December 2004, Waters negotiated the sale of the publishing rights to the unclassified manuscript to Dutton, a division of Penguin Group (USA), Inc., based on the version of *Class 11* that had been cleared for release by the PRB in September 2004. Complaint at ¶14; Waters Decl. at ¶3. The formal agreement was signed with Dutton on February 5, 2005. Declaration of Mitchell Hoffman at ¶2 (dated March 7, 2006) ("Hoffman Decl."), attached at Exhibit "30". The CIA was timely made aware of this fact.

During the Spring and Summer 2005, Dutton editors worked with Waters to edit the manuscript into a more publishable form. Dutton requested Waters "to make certain changes to the existing text in order to, among other reasons, tighten the writing, or help clarify content for the prospective reader who might not be familiar with the topic. Many of the changes were nothing more than edits of punctuation, spelling and grammar", which Waters had been led to believe by the CIA did not require resubmission for review. Id. at ¶5. "The few substantive additions that were made were primarily references from the public record that Dutton wanted to see expanded, and was very similar to information already approved in the Work by the CIA or had been approved by the CIA in another literary publications." Id. In August 2005, Dutton tentatively scheduled

publication of the Work for March 2006, and included it in Dutton's Winter 2006 catalogue, which is distributed to the book-publishing trade and to the media. Id. at ¶6.

Nine months later, on September 27, 2005, not having received any word from the PRB, Waters submitted, via facsimile and e-mail, final additional changes to the manuscript, most of which had originated with Dutton. Id. at ¶7; Complaint at ¶15; Waters Decl. at ¶3. Waters noted that the changes included "edits on punctuation, spelling and grammatical errors that [Paul Noel Chretien] indicated did not need further review." Six specific substantive changes (all highlighted in yellow for the convenience of the PRB) were addressed and, as usual, Waters supplied open public source or previously declassified materials to justify the changes. In light of the PRB's previous reviews of the manuscript and the conversations with Waters absolutely no objections were anticipated because all additions conformed to approved prior practice. Dutton Decl. at ¶7. Finally, Waters informed the PRB that a fast turnaround was requested due to a scheduled release date of March 2, 2006. Complaint at ¶15; Waters Decl. at ¶3; Exhibits "10a", "10b". This was more than enough time for the PRB to complete its review of the minor substantive additions to the text Waters had submitted.

The PRB acknowledged receipt of the faxed pages via e-mail dated September 28, 2005. It also suggested that Waters send them a complete copy of the manuscript in order to avoid a delay in obtaining page proofs during to the upcoming holiday season. Complaint at ¶16; Exhibit "11". Clearly, the PRB was aware that the book was now being prepared by Dutton to be published which meant copies of the pages were being disseminated to relevant people in the copyediting process. Yet the PRB neither objected nor instructed Waters to take any action. By e-mail dated October 4, 2005, Waters

submitted to the PRB a copy of the previously approved manuscript, which included the recent minor additions, Dutton's cover design for the book jacket and the photographic images that had been submitted to Dutton which the CIA had approved in December 2004. Complaint at ¶17; Waters Decl. at ¶3; Exhibit "12".

On October 15, 2005, Waters provided Dutton with a final version of the manuscript that reflected the changes requested by Dutton. Hoffman Decl. at ¶8. By e-mail dated October 20, 2005, Waters inquired of the status of the PRB's review. Id. at ¶18; Waters Decl. at ¶3; Exhibit "13". By e-mail dated October 21, 2005, the PRB responded that "[a]ll we can report is that it is still under review and that we are pushing for a timely response." Complaint at ¶19; Exhibit "14".

By e-mail dated December 13, 2005, the PRB notified Waters that the "status of our review of your rewritten manuscript 'Class 11' is that we are attempting to set-up a meeting with our fellow reviewers in another office to compare notes. When this is done, we will compose our response to you. Please note that the unapproved manuscript should not be shared with others until final PRB approval is given and that galley proofs must also be approved before publishing." These assertions contradicted prior PRB statements that did not impose any such stated requirements. Id. at ¶20; Exhibit "15". Nor did it make any sense as the PRB was well aware that the manuscript was already in the hands of the publisher and had been for some time.

By e-mail dated December 14, 2005, Waters expressed his surprise at the PRB's statement that additional review is ongoing and its reversal regarding his ability to disseminate the manuscript. He noted that the PRB had failed to respond to him within 30 days as required by law and policy, and had never contacted him to either request or even

notify him of any need for an extension of time to complete their review (something that had been done before during the first 2004 review). Therefore, the manuscript had been "copy edited" in anticipation of a stated March 2006 publication date. Complaint at ¶21; Waters Decl. at ¶3; Exhibit "16"; Hoffman Decl. at ¶9.

By letter dated December 29, 2005, Waters forwarded to the PRB a copy of the manuscript's galley proofs. He also noted that this version was identical to the one the PRB had received electronically in October 2005. Complaint at ¶22; Waters Decl. at ¶3; Exhibit "17". By e-mail dated December 30, 2005, the PRB acknowledged receipt of the manuscript's gallery proofs. Waters was informed that he "must wait for our final approval before publishing." Additionally, he was notified that "you do not have the Agency's final approval to publish except for the material we have specifically approved. As with any review where we ask for deletions or changes, you need to resubmit the material or certify in writing that they were made." Thus, again, the PRB contradicted itself, as compared to its e-mail dated December 13, 2005, regarding Waters' ability to disseminate and publish previously approved text. Complaint at ¶23; Exhibit "18".

By e-mail dated December 30, 2005, Waters informed the PRB that he believed he had complied with all PRB requirements and regulations. Complaint at ¶24 Waters Decl. at ¶3; Exhibit "19". By e-mail dated January 3, 2006, the PRB informed Waters that the 30 day review deadline is "an administrative guidance and, depending on the *complexity and length of the material, can be longer*." (emphasis original). It was also noted that "if we exceed the 30 days, there is not an automatic default of approval – you must wait for our explicit approval to publish (i.e., share the material with someone else)." Complaint at ¶25; Waters Decl. at ¶3; Exhibit "20". Upon information and belief, the PRB fails to

9

notify submitters of this policy notwithstanding its knowledge that individuals routinely hold a contradictory interpretation of the PRB asserted review policy. In fact, the PRB Chairman had personally given Waters copies of briefing slides he used that specifically noted there was a 30-day deadline. No mention was made of the CIA's ability to extend that deadline. Exhibit "21".

By e-mail dated January 8, 2006, Waters responded that the PRB's interpretation of the 30 day deadline was not consistent with published policies. Additionally, he made clear that the two small sets of changes that were previously submitted "were fully cited from public sources, were fictionalized to mask sensitive information, or were pulled directly from materials previously approved by the PRB." Complaint at ¶26; Waters Decl. at ¶3; Exhibit "22". By letter dated February 3, 2006, Waters notified Richard Puhl, Chairman, PRB, that "[h]aving received no redactions or other written correspondence regarding the publisher's galleys for Class II submitted on 29 December 2005, we have finalized the manuscript for publication in April." Complaint at ¶27; Waters Decl. at ¶3; Exhibit "23".

By facsimile dated February 15, 2006, the PRB notified Waters of dozens of required deletions, which included substantial portions of text that had previously undergone PRB/CIA review and had been determined to be unclassified and authorized for release. Complaint at ¶28; Exhibit "24".Upon information and belief, the CIA failed, as required by the applicable Executive Order, to notify the Information Security Oversight Office of these reclassifications. See Declaration of Mark S. Zaid, Esq. at *passim* (dated March 7, 2006)("Zaid Decl."), attached at Exhibit "29". The PRB's letter contained characterizations completely inconsistent with prior PRB policies in general and

specifically with respect to prior communications with Waters. The PRB now claimed that legal obligations, never before imposed, prevented Waters from disseminating any copies of the manuscript, much less publishing it, without specific formal approval from the PRB of the final, ready to be published, document. This statement was logically inconsistent given the fact that the CIA was well aware Waters had sold the manuscript to Dutton in December 2004, and for months had been in the process of moving towards publication.

The CIA's attitude had changed as well. In a previous communication dated September 1, 2004, the CIA respectfully encouraged Waters to include the disclaimer: "*This material has been reviewed by the CIA. That review neither constitutes CIA authentication of information nor implies CIA endorsement of the author's views.*" Exhibit "6". Now the CIA demanded as mandatory that the book state: "*All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official position or views of the Central Intelligence Agency (CIA) or any other U.S. Government agency. Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information or Agency endorsement of the author's views. This material has been reviewed by the CIA to prevent the disclosure of classified information.*" Exhibit "24".

Upon information and belief, the PRB has adopted and is implementing more restrictive policies concerning the publication of any manuscripts by former or current CIA employees. As a result, it is arbitrarily and inconsistently classifying information that is clearly unclassified or was previously approved for publication. This new policy, which emanates from the CIA's Director Porter Goss, is intended to dissuade individuals

to publish information, even if unclassified, about their former or current activities with

the CIA. Upon further information and belief, the former PRB Chairman, Paul Noel

Chretien, left his position as Chairman due to, at least in part, his opposition to the

current CIA PRB policies that infringe upon the First Amendment rights of submitters.

Complaint at ¶29.

     Waters' book, now entitled "*Class 11: Inside the CIA's First Post-9/11 Spy Class*", is

scheduled for publication on April 6, 2006. Pre-publication orders are already being

accepted by such online retailers such as *www.Amazon.com*. Even though the book has

not been issued, it has already, as of the date of this filing, ranked as high as #2,022.

However, the final pages, dust jackets and hardcover "casings" are already printed.

Hoffman Decl. at ¶13. Dutton needs only to bind these materials to produce finished

books. Id. The CIA's delay tactics and reclassification of previously approved

information will cost Waters no less than $9,000 should a new version of the book need

to be created, not to mention potential loss of sales, and a significant loss of time before

publication can actually take place. Complaint at ¶31; Hoffman Decl. at ¶14.

## PRELIMINARY STATEMENT REGARDING OVERCLASSIFICATION, PREPUBLICATION REVIEW AND THE NEED TO EXPEDITE FIRST AMENDMENT CHALLENGES

     This case presents a threat to the vitality of First Amendment rights among former

and current employees of the government, as well as its contractors, arising from the

government's attempt to impose a prior restraint on publication. In this instance the CIA

has sought to permanently block the publication of portions of Waters' manuscript.

     Having absolutely no lawful authority to take these actions, the CIA endeavors to

cloak its behavior as legitimate by hiding behind an unconstitutional interpretation of the

secrecy agreement executed by Waters. However, the ability of the government to inhibit

First Amendment rights extends only to that information that is properly classified. The

dissemination or publication of unclassified information, which is all the manuscript contains, cannot be blocked by the government. This case represents yet another effort by the CIA to crack down on openness, intimidate its former and current employees and prevent the free flow of information that pertains to its activities, no matter how embarrassing or revealing it might be.

> Excessive secrecy has significant consequences for the national interest when, as a result, policymakers are not fully informed, government is not held accountable for its actions, and the public cannot engage in informed debate. This remains a dangerous world; some secrecy is vital to save lives, bring miscreants to justice, protect national security, and engage in effective diplomacy. Yet as Justice Potter Stewart noted in his opinion in the Pentagon Papers case, when everything is secret, nothing is secret. Even as billions of dollars are spent each year on government secrecy, the classification and personnel security systems have not always succeeded at their core task of protecting those secrets most critical to the national security. The classification system, for example, is used too often to deny the public an understanding of the policymaking process, rather than for the necessary protection of intelligence activities and other highly sensitive matters.

Report of The Commission on Protection on Protecting and Reducing Government Secrecy xxi (GPO, 1997).[3]

The Commission concluded that "[t]he best way to ensure that secrecy is respected, and that the most important secrets remain secret, is for secrecy to be returned to its limited but necessary role. Secrets can be protected more effectively if secrecy is reduced overall." Id. The Commission enumerated the advantages of an American democratic system that permits the withholding of information only if its publication would truly cause harm to the nation.

---

[3] The Government's primary classification expert testified to Congress that overclassification remains a serious problem. See e.g. Statement of J. William Leonard, Director, Information Security Oversight Office, National Archives & Records Administration, Before the Committee on Government Reform, Subcommittee on National Security, Emerging Threats, and International Relations, U.S. House of Representatives, March 2, 2005 ("it is my view that the Government classifies too much information"), available at *http://reform.house.gov/UploadedFiles/ISOO%20Leonard%20testimony%20final%203-2-05%20hearing.pdf*.

> Greater openness permits more public understanding of the Government's actions and also makes it more possible for the Government to respond to criticism and justify those actions. It makes free exchange of scientific information possible and encourages discoveries that foster economic growth. In addition, by allowing for a fuller understanding of the past, it provides opportunities to learn lessons from what has gone before making it easier to resolve issues concerning the Government's past actions and helping prepare for the future.

Id.

One of the central purposes of the First Amendment is to allow publication to serve as both a critical source of information for the public as well as an important government watchdog. Waters has written a book that contains unique information regarding his experiences as a member of the first post 9/11 class of CIA recruits. Although Waters properly and fully abided by the pre-publication review requirements imposed by his secrecy agreement, the CIA has responded in a manner that has violated his First Amendment rights. It has frustrated the publication of the book by unreasonably asserting classification determinations that are known to be unjustified. Such conduct violates the rights of free speech guaranteed by the First Amendment of the Constitution of the United States.

It is well settled by courts throughout the United States that, notwithstanding the fact that this motion is filed pursuant to seeking a preliminary/permanent injunction (which itself sets strict time frames), expedited attention should be given to cases involving First Amendment interests. See, e.g., Action for Children's Television v. FCC, 59 F.3d 12449, 1259 (D.C. Cir. 1995)(finding that "possibility that the agency's actions might similarly run afoul of the first amendment demands prompt judicial scrutiny") cert. denied, 116 S.Ct. 773 (1996); Bernard v. Gulf Oil Co., 619 F.2d 495, 470 (5th Cir. 1980), aff'd, 452 U.S. 89 (1981)("Fragile First Amendments rights are often lost or prejudiced by delay….Court have therefore been commendably willing to expedite proceedings involving First Amendment rights"); National Student Ass'n v. Hershey, 412 F.2d 1103,

1115 (D.C.Cir. 1969)(recognizing "urgency of prompt protection for frail First Amendment interests"); <u>Potwora v. Dillon</u>, 386 F.2d 7, 76 (2d Cir. 1967)(hearing case on expedited basis "[i]n light of plaintiffs' representation that the order deprived them of important First Amendment rights").[4]

In the landmark case involving efforts by *The New York Times* and *The Washington Post* to publish the "Pentagon Papers" more than thirty years ago, the entire litigation process - from the district courts to the Supreme Court of the United States - occurred within a two week time frame (notwithstanding the existence of seriously sensitive classification concerns that far exceed the determinations in this case). This was necessary because of the serious First Amendment issues at stake and despite the fact that the documents in question had been in the newspapers' possession for several months prior to the time of the desired publication. <u>See</u> <u>New York Times Co. v. United States</u>, 403 U.S. 713, 724 (1971)(Douglas, J., concurring).

The CIA's conduct here is nothing less than what occurred three decades ago: an unconstitutional attempt to preclude Waters' right to publish information of which the government has no authority to control. Courts have shown no tolerance for any attempt to inhibit free expression that does not permit a prompt administrative and/or judicial review of the efforts to repress speech. In the leading case of <u>Freedman v. State of Maryland</u>, 380 U.S. 51, 59-60 (1965), the Supreme Court held that providing a mechanism for prompt review is necessary to avoid offending constitutional protections. Numerous courts thereafter faced with restrictions on the content of speech have gone to great lengths to ensure that prompt judicial review was readily available. <u>See</u> <u>Collin v.</u>

---

[4] <u>See</u> <u>also</u> <u>Auvil v. CBS "60 Minutes"</u>, 800 F. Supp. 928, 937 (E.D. Wash. 1992)("The public interest is best served by expeditious disposition of cases raising First Amendment issues."); <u>Collin v. Smith</u>, 447 F. Supp. 676, 680 (N.D. Ill. 1978)(ordering "trial on an expedited schedule in view of the compelling national interest in prompt resolution of cases implicating First Amendment freedoms"); <u>American Camping Ass'n v. Whalen</u>, 465 F. Supp. 327, 330 (S.D.N.Y. 1978)(finding a "prompt trial on the merits is required" with First Amendment rights at stake).

Smith, 578 F.2d 1197, 1209 (7th Cir. 1978)("We have endeavored to expedite decision, because to delay the exercise of First Amendment rights in itself burdens them and may risk their destruction."); Quarter Action Group v. Hickel, 421 F.2d 1111, 1116 (D.C. Cir. 1969)(noting "any delay in the exercise of First Amendment rights constitutes an irreparable injury to those seeking such exercise")(citation omitted).

Moreover, the CIA cannot lawfully prevent Waters' attorney, who holds the appropriate "limited security access approval"[5], from reviewing the unredacted copy of his client's manuscript in order to assist in this classification challenge.[6] Thus, this case presents sensitive and important First Amendment questions that cry out for immediate resolution.

## ARGUMENT

The legal standard Waters must meet in moving for a preliminary/permanent injunction will not be in dispute. "A court considering a plaintiff's request for a preliminary injunction must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by the injunction." Serono Lab v. Shalala, 158 F.3d 1313, 1317-18 (D.C.Cir 1998). See Sea Containers Ltd. v. Stena AB, 890 F.2d 1205,

---

[5] The term "limited security access approval" is one which the CIA uses to reference the type of access provided to private attorneys who handle CIA cases involving classified information. The term, however, does not exist in any statutory, regulatory or Executive Order provision. Based on a National Agency Check, or NAC, private attorneys are essentially granted interim Secret clearances. The undersigned counsel has had access to such CIA information for years.

[6] In the most recent prepublication review case litigated in the United States, the D.C. Circuit noted that a background check on the undersigned counsel that was ordered by the District Court to determine whether counsel could be trusted with access to a classified manuscript "found that Mr. Zaid was trustworthy." Stillman v. CIA et al., 319 F.3d 546, 548 (D.C.Cir. 2003).

1208 (D.C.Cir. 1989); <u>Washington Metro Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C.Cir. 1977).

The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. <u>CSX Transp., Inc. v. Williams</u>, 406 F.3d 667 (D.C.Cir. 2005), <u>citing</u> <u>CityFed Fin. v. Office of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C.Cir. 1995). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." <u>Id</u>. Moreover, the other salient factor in the injunctive relief analysis is irreparable injury. A movant must "demonstrate at least 'some injury'" to warrant the granting of an injunction. <u>Id</u>. (quotation omitted).

In determining whether to enter a permanent injunction, the Court considers a modified iteration of the factors it utilizes in assessing preliminary injunctions: (1) success on the merits, (2) whether the plaintiff will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to the defendant or other interested parties, and (4) whether the public interest favors granting the injunction. <u>See</u> <u>ACLU v. Mineta</u>, 319 F. Supp. 2d 69, 87 (D.D.C. 2004); <u>National Ass'n of Psychiatric Health Systems v. Shalala</u>, 120 F. Supp. 2d 33, 44 (D.D.C. 2002). <u>See also</u> <u>Amoco Production Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n. 12 (1987)("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); <u>National Mining Ass'n v. U.S. Army Corps of Engineers</u>, 145 F.3d

1399, 1408-09 (D.C.Cir. 1998)(demonstration of actual success on the merits required for permanent injunctive relief).

Additionally, at this early stage of the proceedings, the Court may rely on the sworn declarations in the record and other credible evidence even though such evidence might not meet all of the formal requirements for admissibility at a trial. See University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)(decision on a preliminary injunction may be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); Cobell v. Norton, 391 F.3d 251, 261 (D.C. Cir. 2004)(same); see also Heideman v. South Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003)("The Federal Rules of Evidence do not apply to preliminary injunction hearings.").

## I.  WATERS MEETS THE REQUIREMENTS FOR THE GRANTING OF A PRELIMINARY AND PERMANENT INJUNCTION[7]

### A.  Waters Can Demonstrate Actual Success As Well As A Substantial Likelihood That He Will Succeed On The Merits

This case arises in a posture significantly different from a request for release of CIA information under the Freedom of Information Act ("FOIA").  In a FOIA case, an individual seeks to compel release of documents in the government's possession.  Here,

---

[7] A "preliminary" injunction is somewhat of a misnomer as applied to these specific circumstances. Should the Court grant Waters favorable preliminary relief it would be necessary for Waters to then immediately seek permanent relief. In this case a preliminary injunction would be tantamount to a permanent one as such relief would provide a green light to publication. Obviously once publication transpires the genie is let out of the bottle and cannot be placed back in, which would moot any later reconsideration by this Court absent the granting of a stay pending appeal by the CIA. Therefore, should favorable relief be granted this Court should respectfully take any and all immediate steps to convert a preliminary judgment into a permanent one, whether through the appropriate exercise of judicial authority or by setting an extremely expedited briefing schedule to finalize the judgment. Additionally, should this Motion be denied, Waters respectfully requests that this Court set an expedited briefing schedule to resolve this dispute following discovery, if deemed appropriate.

by contrast, Waters wishes publicly to disclose information that he already possesses, and the CIA has ruled that his secrecy agreement forbids disclosure.

This difference between seeking to obtain information and seeking to disclose information already obtained raises Waters' constitutional interests in this case above the constitutional interests held by a FOIA claimant. As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information. See e.g., Houchins v. KQED, Inc., 438 U.S. 1, 8-9 (1978)(plurality opinion); Saxbe v. Washington Post Co., 417 U.S. 843, 849 (1974); Pell v. Procunier, 417 U.S. 817, 831-32 (1974). A litigant seeking release of government information under FOIA, therefore, relies upon a statutory entitlement – as narrowed by statutory exceptions – and not upon his constitutional right to free expression.

"In this case, however, [Waters] wishes to publish information he possesses, and the CIA wishes to silence him. Although neither the CIA's administrative determination nor any court order in this case constitutes a prior restraint in the traditional sense upon [Waters] or any other party, the entire scheme of prepublication review is designed for the purpose of preventing publication of classified information. [Waters] therefore has a strong first amendment interest in ensuring that CIA censorship of his [manuscript] results from a proper classification of the censored portions." McGehee v. Casey, 718 F.2d 1137, 1142, 1147-48 (D.C.Cir. 1983). Cf. Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362, 1367 (4th Cir.)("the deletion items should be suppressed only if they are found to be both classified and classifiable under the Executive Order"), cert. denied, 421 U.S. 992 (1975).

At the outset it should be made clear that Waters does not challenge the existence of or the requirement to adhere to a prepublication review process. In <u>Snepp v. United States</u>, 444 U.S. 507 (1980)(per curiam), the Supreme Court held that the CIA could, consistent with the First Amendment, recover damages for breach of a secrecy agreement under which a former employee promised to submit CIA-related writings to the CIA for prepublication clearance. The Court found the secrecy agreement to be "a reasonable means for protecting" the "secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." <u>Id</u>. at 509 n.3.[8] In <u>Snepp</u>, the former employee published CIA-related information without submitting his manuscript for prepublication review.  The ruling in <u>Snepp</u>, therefore, did "not depend upon whether [Snepp's] book actually contained classified information….The Government simply claimed that … Snepp should have given the CIA an opportunity to determine whether the material he proposed to publish would compromise classified information or sources." <u>Id</u>. at 511.

In this case, by contrast, Waters adhered to his secrecy agreement. He submitted his manuscript for prepublication review, and deleted portions of his book in accordance with the CIA's orders. At issue here is the constitutionality of the CIA's substantive

---

[8] In its basic essence the secrecy agreements typically executed by CIA Officers such as Waters mandate agreement to submit for review any material "I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment...or at any time thereafter, prior to discussing it or showing it to anyone who is not authorized to have access.... I further agree that I will not take any steps toward public disclosure until I have received written permission to do so from the Central Intelligence Agency." CIA Secrecy Agreement, Form 368, <u>cited in</u> Hedley, John Hollister, *Reviewing the Work of CIA Authors: Secrets, Free Speech, and Fig Leaves*, <u>Studies in Intelligence</u> (Spring 1998)(citations omitted)("Hedley CIA PRB Article"), attached at Exhibit "26" (and available online at *http://www.odci.gov/csi/studies/spring98/Secret.html*).

application of its classification decisions, the delay at which it renders those decisions and its interference with Waters' constitutional rights to communicate with counsel.

Waters' secrecy agreement applies only when he seeks to publish "classified information" that "has come or shall come to [his] attention by virtue of [his] connection with the Central Intelligence Agency." <u>McGehee</u>, 718 F.2d at 1142. As the D.C. Circuit has noted, secrecy agreements, such as the ones Waters' executed, do not extend to "unclassified materials or to information obtained from public sources." <u>Id</u>. The government may not censor such material, "contractually or otherwise." <u>United States v. Marchetti</u>, 466 F.2d 1309, 1313 (4th Cir.), <u>cert. denied</u>, 409 U.S. 1063 (1972). "The government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." <u>McGehee</u>, 718 F.2d at 1141. <u>Accord</u> <u>Snepp</u>, 444 U.S. at 513 n.8 ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"). <u>See also</u> <u>Stillman</u>, 319 F.3d at 548 (if information not classified properly, manuscript can be published).

   1.   <u>The CIA Cannot Lawfully Prevent The Disclosure Of Unclassified Information Within Waters' Book And All Text Submitted Prior To December 2004 Was Officially Approved For Release By The CIA</u>

At this time there is nothing known about why the CIA considers portions of Waters' current manuscript version to be classified, much less the alleged classification level. However, both are irrelevant at the outset because the CIA cannot prevent Waters from publishing any of the text within his manuscript that had been officially approved for release by the CIA, notwithstanding the CIA's present reversal of a significant number of its decisions.

21

Nearly 175 pages of Waters' book that now allegedly contain classified information was previously reviewed and approved for release by the CIA. A comparison list of pages approved in 2004 that now contain unapproved text is at Exhibit "27". In reliance on the CIA's determination of September 20, 2004, determination, see Exhibit "6", Waters disseminated the manuscript to third parties. As a result, Dutton purchased the CIA approved manuscript. The CIA was contemporaneously aware of both of these facts.

A copy of the current unclassified, 2006 redacted version of Waters' manuscript is attached at Exhibit "25". It has been filed under seal in order to protect its proprietary value.[9]  Of course, in order to render a decision in this case it will be necessary for the Court to obtain copies of an unredacted version of the 2004 and 2006 manuscripts.[10]

       i.   *The CIA Is Estopped From Preventing Waters From Publishing Any Previously Approved Text Within His Manuscript Given The Assurances He Was Provided By CIA Officials Exercising Actual Authority*

The doctrine of equitable estoppel is not, in itself, either a claim or a defense. It is "an equitable doctrine invoked to avoid injustice in particular cases." Heckler v. Community Health Services, 467 U.S. 51, 59 (1984). It is also a means of precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct. See generally 3 J. POMEROY, EQUITY JURISPRUDENCE § 804, at 189 (5th ed. 1941); Note, *Equitable Estoppel of the Government*, 79 COLUM. L. REV. 551, 552 (1979). Thus, a plaintiff seeking the benefit

---

[9] "The written material submitted to it is the private property of an author; it is copyrighted, proprietary information." Hedley CIA PRB Article, attached at Exhibit "26".

[10] This can be accomplished by either having Waters submit copies directly to Chambers (in light of the alleged classification sensitivities), or the CIA can certainly include copies as part of its response, or via any other method requested by the Court.

of equitable estoppel must have some claim, sounding in equity or in law, that otherwise entitles it to prevail against the defendant.

The circumstances in which the government may be estopped from asserting a claim or a defense are not well-defined, but "it is well settled that the Government may not be estopped on the same terms as any other litigant." Heckler, 467 U.S. at 60 (footnote and citations omitted). Although the Supreme Court has apparently never expressly applied the doctrine against the government, and regards as open the question whether the government may be estopped under any circumstances, see id.; Lyng v. Payne, 476 U.S. 926 (1986); but see United States v. Lazy FC Ranch, 481 F.2d 985, 988 (9th Cir. 1973) (suggesting that Supreme Court applied "rationale" of equitable estoppel against the government in Moser v. United States, 341 U.S. 41 (1951)), the D.C. Circuit has said that "the fundamental principle of equitable estoppel applies to government agencies, as well as private parties." ATC Petroleum, Inc. v. Sanders, 860 F.2d 1104, 1111 (D.C.Cir.1988), quoting Investors Research Corp. v. SEC, 628 F.2d 168, 174 n.34 (D.C.Cir. 1980)(citing 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 17.01-17.04 (1958 & Supp.).

That being said, this Circuit has additionally noted that "despite the doctrine's flexibility in disputes between private parties, its application to the government must be rigid and sparing." ATC Petroleum, 860 F.2d at 1111; Rann v. Chao, 346 F.3d 192, 197 (D.C.Cir. 2003).

> The case for estoppel against the government must be compelling, and will certainly include proof of each of the traditional elements of the doctrine – "'false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance,' as well as . . . 'a showing of an injustice . . . and lack of undue damage to the public interest.'"

International Org. of Masters, Mates & Pilots v. Brown, 698 F.2d 536, 551 (D.C.Cir. 1983), quoting Hoeber v. District of Columbia Redevelopment Land Agency, 483 F. Supp. 1356, 1365-66 (D.D.C. 1980), aff'd mem., 672 F.2d 894 (D.C.Cir. 1981). Put another way, in order to succeed a plaintiff's claim of estoppel must demonstrate the essential elements of such a claim which requires a showing that: (1) there was a "definite" representation to the party claiming estoppel; (2) the party relied on its adversary's conduct to his detriment; and (3) the reliance on the representation was "reasonable." Graham v. SEC, 222 F.3d 994, 1007 (D.C.Cir. 2000), quoting Heckler, 467 U.S. at 59.

At least one judge in this District has made it clear that there are definitely circumstances in which an agency may be "bound by the representations of its employees to members of the public." Hertzberg v. Veneman, 273 F. Supp.2d 67 (D.D.C. 2003), citing Office of Personnel Management v. Richmond, 496 U.S. 414, 421, 423 (1990); ATC Petroleum, Inc., 860 F.2d at 1111; Grumman Ohio Corp. v. Dole, 776 F.2d 338, 347 (D.C. Cir. 1985). "With respect to the representations of agency employees, this standard has been interpreted to require that 'government agents engage -- by commission or omission -- in misrepresentation or concealment, or, at least, behave in ways that have or will cause an egregiously unfair result.'" Hertzberg, 273 F.Supp.2d at 83, quoting Grumman Ohio Corp., 776 F.2d at 347 (quoting General Accounting Office v. General Accounting Office Personnel Appeals Board, 698 F.2d 516, 526 n.57 (D.C. Cir. 1983)).

The CIA here is bound by the pronouncements of its officials within the PRB. The assurance provided to Waters on September 20, 2004 that the text of his manuscript was approved for release was most certainly definite and authorized. Exhibit "6". Indeed, the

assurance was made by a CIA official – in this case the PRB Chairman – with actual authority to issue the decision. Waters relied upon that assurance, after meeting the CIA's demands to redact four additional words, and disseminated his manuscript to third parties to include Dutton. Dutton, in turn, also relied upon the CIA's assurances that the manuscript it purchased had been approved for release. This reliance, as it turns out, was to their detriment as now the CIA has reversed its position and is threatening Waters with criminal and civil penalties. Exhibit "24".

Finally, in light of the unequivocal statement from the PRB Chairman in his September 20, 2004, response, it was certainly reasonable of Waters to believe he had been provided with approval to publish the text within his manuscript that had been cleared at that time.

> ii.  The CIA Is Estopped From Preventing Waters From Publishing Any Text Submitted After December 2004 Due To The PRB's Silence When It Had A Duty To Speak Within 30 Days Of Waters' Submission

The estoppel doctrine has also been applied to preclude a party from profiting by keeping silent when it has a duty to speak. See ATC Petroleum, 860 F.2d at 1112; United States v. Georgia-Pacific Co., 421 F.2d 92, 96 (9th Cir. 1970); Management & Investment Co. v. Zmunt, 59 F.2d 663, 664 (6th Cir. 1932). As Grumman Ohio Corp. noted, "omission" by agency employees, especially when "misrepresentation or concealment" caused the plaintiff to "behave in ways that have or will cause an egregiously unfair result" can lead to the application of estoppel. Grumman Ohio Corp., 776 F.2d at 347.

It would neither have been unduly burdensome or unreasonable for the CIA to issue a classification decision within 30 days. In fact, it issued a substantive decision on the

entire manuscript just three days after receipt of changes. <u>See</u> Exhibits "4" – "6". At the very least it was required to notify Waters that additional time was required for a decision to be rendered (which it did do on at least one occasion while Paul Noel-Chretien served as PRB Chairman). Instead, the CIA chose to do and say nothing.

In its e-mail dated January 3, 2006, the PRB informed Waters that the 30 day review deadline is "an administrative guidance and, depending on the *complexity and length of the material, can be longer*." Exhibit "20" (emphasis original). It was also noted that "if we exceed the 30 days, there is not an automatic default of approval – you must wait for our explicit approval to publish (i.e., share the material with someone else)." <u>Id</u>. Yet this is not at all what the PRB publicly tells its submitters.

To the contrary, the PRB routinely leads submitters to believe that the 30-day deadline is, in fact, a legally binding deadline. In 2003, then PRB Chairman Paul Noel-Chretien provided Waters copies of unclassified briefing slides that he used to explain the PRB process to CIA employees. <u>See</u> Exhibit "21". These slides very clearly acknowledge the existence of a firm 30-day deadline (including referring to court authorization). <u>Id</u>. Although one slide references that the PRB is increasingly finding it "difficult to meet" the 30-day deadline, nowhere is it mentioned that the CIA can take longer than the 30-days, request an extension of time or that this "deadline" is nothing more than "administrative guidance".

Moreover, the CIA's own unclassified journal, which is publicly available on its website, unequivocally asserts that the CIA faces a 30-day deadline for compliance in reviewing a submitted publication. In an article written by then PRB Chairman John Hollister Hedley, it states:

> The courts have held that this signed agreement is a lifetime enforceable contract. The courts also have noted that the secrecy agreement is a prior restraint of First Amendment freedom. But they ruled it a legitimate restraint, provided it is limited to the deletion of classified information and so long as a review of a proposed publication is conducted and a response given to its author within 30 days.[11]

Hedley CIA PRB Article, attached at Exhibit "26". Furthermore, most secrecy agreements provide for prepublication review to be completed within thirty days. One such agreement, for example, explicitly states:

> I further understand that the Department or Agency to which I have submitted materials will act upon them, coordinating within the Intelligence Community when appropriate, *and make a response to me within a reasonable time, not to exceed 30 working days from date of receipt.*

Exhibit "28" at ¶5 (emphasis added). The secrecy agreements, which are of course created by the Government, are contractual in nature from both sides. If the CIA can sue an individual for violation of their contractual obligation for failing to adhere to the terms of their secrecy agreement, so too can an individual hold the CIA accountable for its failure to meet an explicit term of the agreement.

Moreover, the Fourth Circuit Court of Appeals in Marchetti held that the prepublication review process was constitutional *provided* the agency acted on, and responded to, the request quickly.[12]

---

[11] The footnote to this sentence reads "[t]The 30-day time constraint was set forth by the circuit court decision in US v. Marchetti, 466 F2d 1309, 1317 (4th Cir. 1972). It was reiterated in US v. Snepp, 595 F2d. 934 (4th Cir. 1979), and it has been adopted as the standard by the Department of Justice."

[12] Justice Stevens has also noted that "[t]he mere fact that the Agency has the authority to review the text of a critical book in search of classified information before it is published is bound to have an inhibiting effect on the author's writing. Moreover, the right to delay publication until the review is completed is itself a form of prior restraint that would not be tolerated in other contexts." Snepp, 444 U.S. at 526 fn.17 (Stevens, J., dissenting).

> Because we are dealing with a prior restrain upon speech, we think the
> CIA must act promptly to approve or disapprove any material which may
> be submitted to it by Marchetti. Undue delay would impair the
> reasonableness of the restraint, and that reasonableness is to be maintained
> if the restraint is to be enforced. We should think that, in all events, the
> maximum period for responding after the submission of material for
> approval should not exceed thirty days.

Marchetti, 466 F.2d at 1317. See also Weaver v. U.S. Information Agency, 87 F.3d 1429,

1441 (D.C.Cir. 1996)("The primary burden on employees from the regulation is simply

the delay associated with submitting to the review process prior to publication. If the

prior review were extensive, of course, it might delay constitutionally protected speech to

a time when its only relevance was to historians.").

The PRB is well aware that submitters believe the 30-day deadline is enforceable,

much less is considered meaningful. Indeed the PRB itself publicizes through articles and

briefings the existence of the deadline. It is nothing short of reasonable that, as a result,

individuals believe that should the PRB not respond within the 30-day deadline then the

CIA has no concerns regarding the submitted information. Most certainly, an individual

can properly and reasonably rely on this being the case when the PRB is silent for months

and months on even the most minor of issues.

The PRB has created for itself a legal obligation to inform those who submit

documents for classification review that, in the appropriate circumstances, if it cannot

meet the 30-day deadline it will notify the individual of the need for an extension.

Additionally, it has created for itself a legal obligation to dispel the notion that it

promotes that the CIA's failure to meet the 30-day deadline does not authorize the release

of the contested text.

The PRB's failure to promote its policies with clarity, much less its actions to

inconsistently publicize its policies, led Waters to behave in ways, i.e., dissemination,

sale and forthcoming publication of his manuscript, that have or will cause an egregiously

unfair result, i.e., the CIA forbidding him to publish, incurring financial losses and potentially facing civil and/or criminal penalties.

      2.  <u>All Of Waters' Submissions, Including Those Provided In December 2004 And September 2005, Are Unclassified And The CIA Must Provide Detailed Articulation To the Contrary</u>

The D.C. Circuit has twice provided guidance to the district courts on how to handle prepublication classification challenges first in <u>McGehee</u> and more recently in <u>Stillman</u>. As the Circuit originally stated in <u>McGehee</u>:

> Because the present case implicates first amendment rights, however, we feel compelled to go beyond the FOIA standard of review for cases reviewing CIA censorship pursuant to secrecy agreements.  While we believe courts in securing such determinations should defer to CIA judgment as to the harmful results of publication, they must nevertheless satisfy themselves from the record, *in camera* or otherwise, that the CIA in fact had good reason to classify, and therefore censor, the materials at issue.  *Accordingly, the courts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification. These should not rely on a "presumption of regularity" if such rational explanations are missing.* We anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm. Moreover, unlike FOIA cases, in cases such as this both parties know the nature of the information in question. Courts should therefore strive to benefit from "criticism and illumination by [the] party with the actual interest in forcing disclosure."

719 F.2d at 1148-49 (citations omitted)(emphasis added). <u>Accord</u> <u>Stillman</u>, 319 F.3d at 548-49.

This review will not involve the need to "second-guess CIA judgments on matters in which the judiciary lacks the requisite expertise." <u>McGehee</u>, 719 F.2d at 1149. There will be little, if any, substantive classification decisions in this case that this Court does not possess the requisite level of expertise to rule upon.[13] Indeed, upon review of the

---

[13] <u>See</u> <u>New York Times Co. v. United States</u>, 403 U.S. 713 (1971)(per curiam) (permitting publication of Pentagon Papers despite government's claim that they were "top secret"); <u>Haig v. Agee</u>, 453 U.S. 280, 289 (1981)(President's plenary power over foreign relations, "like every other government power, must be exercised in

decisions, Waters is confident that this Court will categorically reject the majority of the determinations on the basis of absurdity alone. In any event, "while the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the 'protection of individual rights. Considering that 'speech concerning public affairs is more than self-expression; it is the essence of self-government,' and that the line between information threatening to foreign policy and matters of legitimate public concern is often very fine, courts must assure themselves that the reasons for classification are rational and plausible ones." Id. (citations omitted).

In the landmark *Pentagon Papers* case, Justice Brennan wrote that "[t]he entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." New York Times Co. 403 U.S. at 725 (1971).[14]

> When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real, not merely conjectural, and

---

subordination to the applicable provisions of the Constitution."), quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936).

[14]Justice Brennan added that "[e]ven if the present world situation were assumed to be tantamount to a time of war, or if the power of presently available armament would justify in peacetime the suppression of information that would set in motion a nuclear holocaust, in neither of these actions has the Government presented or even alleged that publication of items from or based upon the material at issue would cause the happening of an event of that nature....Thus, only governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order. In no event may member conclusion be sufficient: for if the Executive Branch seeks judicial aid in preventing publication, it must inevitably submit the basis upon which that aid is sought to scrutiny by the judiciary." New York Times Co., 403 U.S. at 726 (Brennan, J., concurring).

that the regulation will in fact alleviate these harms in a direct and
material way.

<u>United States et al. v. National Treasury Employees Union et al.</u>, 513 U.S. 454, 475

(1995).[15]

The governing document concerning the CIA's classification decisions is Executive

Order 13292, which President Bush issued in March 2003 (amending Executive Order

12958 that dated back to 1995). Pursuant to § 1.4 of the Order, information shall not be

considered for classification unless it concerns:

> (a) military plans, weapons systems, or operations;
> (b) foreign government information;
> (c) intelligence activities (including special activities), intelligence
>     sources or methods, or cryptology;
> (d) foreign relations or foreign activities of the United States, including
>     confidential sources;
> (e) scientific, technological, or economic matters relating to the national
>     security, which includes defense against transnational terrorism;
> (f) United States Government programs for safeguarding nuclear
>     materials or facilities;
> (g) vulnerabilities or capabilities of systems, installations,
>     infrastructures, projects, plans, or protection services relating to the
>     national security, which includes defense against transnational
>     terrorism; or
> (h) weapons of mass destruction.

Agencies may not classify information to "conceal violations of law, inefficiency, or

administrative error," "prevent embarrassment to a person, organization, or agency," or

"prevent or delay the release of information that does not require protection in the interest

of the national security." <u>Id</u>. at § 7 (a). Nor can they reclassify information once that

---

[15]"As Justice Brandeis reminded us, a 'reasonable' burden on expression requires a
justification far stronger than mere speculation about serious harms. 'Fear of serious
injury cannot alone justify suppression of free speech and assembly. Men feared witches
and burnt women...To justify suppression of free speech there must be reasonable
grounds to fear that serious evil will result if free speech is practiced.'" <u>National Treasury
Employees Union</u>, 513 U.S. at 475, <u>quoting</u> <u>Whitney v. California</u>, 274 U.S. 357, 376
(Brandeis, J., concurring).

information has been properly declassified unless certain procedural requirements have

been met.[16] The CIA has failed to meet those requirements in this case. See Zaid Decl. at

passim.[17]

Waters believes that this Court will alone be able to render favorable determinations

regarding the misclassification of the CIA's redaction claims when it views the

unredacted text of the manuscript. At this time Waters is unable to further justify his

position because the CIA has not articulated any reasons that would enable any rational

response, and his counsel has not been granted access to the information in order to assist

the response (nor can Waters share the information with him due to the CIA's position

that the information is now classified).

### B. Waters Will Be Irreparably Injured If An Injunction Is Not Granted

The loss of First Amendment rights is generally recognized to constitute irreparable

harm. Elrod v. Burns, 427 U.S. 347, 373 (1976). This Circuit has held, however, that an

injunction is appropriate only when the party seeking relief can show that "First

---

[16] Section 1.7 (c) of Executive Order 13292 governs the specific requirements where
information may be reclassified after declassification. They include when:
(1) the reclassification action is taken under the personal authority of the agency
head or deputy agency head, who determines in writing that the reclassification of
the information is necessary in the interest of the national security; (2) the
information may be reasonably recovered; and (3) the reclassification action is
reported promptly to the Director of the Information Security Oversight Office.

[17] The CIA may argue that the PRB review process does not "declassify" information in
that publication of a private book does not officially acknowledge anything. This is a
technical argument that presents a distinction without a difference. The CIA can only
prevent a former employee from publishing information if it is classified. Ergo, given that
the CIA specifically informed Waters in September 2004, that the entire text – save four
words that were deleted as requested – was approved for release, that text was
"unclassified". The only way in which the CIA can thereafter claim the text cannot be
published, as it did in February 2006, in order to prevent Waters from further
disseminating the manuscript is to "reclassify" the information.

amendment interests [are] either threatened or in fact being impaired at the time relief [is]

sought." Nat'l Treasury Employees Union v. United States, 927 F.2d 1253, 1254

(D.C.Cir. 1991)(internal citations omitted)(correction in original).

   The CIA's actions presently threaten and, in fact, absolutely impair Waters from

directly exercising his First Amendment right through publication of his book *Class 11*.

Additionally, Waters will suffer significant financial losses as well due to the CIA's

actions. Hoffman Decl. at ¶14. Clearly, there is no question that Waters meets whatever

burden exists to demonstrate that he will suffer irreparable injury were this injunction not

to be granted. ACLU v. Mineta, 319 F. Supp. 2d at 87.

   **C.  The Public Interest Will Be Furthered By The Granting Of The Injunction**

   While Waters has a "strong first amendment interest in ensuring that [the defendants']

censorship of his [book] results from a *proper* classification of the censored portions,"

McGehee, 718 F.2d at 1148 (emphasis original), so too is this interest shared by the

general public.

   Generally, public interest concerns are implicated when a constitutional right has

been violated, because all citizens have a stake in upholding the Constitution. Preminger

v. Principi, 422 F.3d 815, 826 (9th Cir. 2005). The public interest inquiry primarily

addresses impact on non-parties rather than parties. Sammartano v. First Judicial Dist.

Court, 303 F.3d 959, 974 (9th Cir. 2002). The potential for impact on non-parties is

plainly present here. Courts considering requests for injunctions have consistently

recognized the significant public interest in upholding First Amendment principles. See

e.g., Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005)

("Vindicating First Amendment freedoms is clearly in the public interest."); Giovani

Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002)("upholding constitutional

rights surely serves the public interest"); Homans v. Albuquerque, 264 F.3d 1240, 1244

(10th Cir. 2001)("We believe that the public interest is better served by following binding

Supreme Court precedent and protecting the core First Amendment right of political expression."); <u>Iowa Right to Life Comm'e, Inc. v. Williams,</u> 187 F.3d 963, 970 (8th Cir. 1999)(finding a district court did not abuse its discretion in granting a preliminary injunction because "the potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms"); <u>Suster v. Marshall,</u> 149 F.3d 523, 530 (6th Cir. 1998) (holding candidates for judicial office were entitled to preliminary injunction of expenditure limit given likelihood of success on the merits, irreparable harm and lack of public interest in enforcing a law that curtailed political speech); <u>Elam Constr., Inc. v. Regional Transp. Dist.,</u> 129 F.3d 1343, 1347 (10th Cir. 1997)(stating, in context of a request for injunctive relief, that "the public interest ... favors plaintiffs' assertion of their First Amendment rights"); <u>G&V Lounge, Inc. v. Mich. Liquor Control Com'n,</u> 23 F.3d 1071, 1079 (6th Cir. 1994)(noting "it is always in the public interest to prevent the violation of a party's constitutional rights"); <u>Cate v. Oldham,</u> 707 F.2d 1176, 1190 (11th Cir. 1983)(holding the "strong public interest in protecting First Amendment values" favored preliminary injunctive relief); <u>People for the Ethical Treatment of Animals v. Gittens,</u> 215 F. Supp. 2d 120, 134 (D.D.C. 2002)("public interest favors a preliminary injunction whenever First Amendment rights have been violated").

Having the CIA comply with not only statutory or regulatory obligations, but the requirements of the Constitution of the United States, is in the public interest, thereby justifying the granting of the requested injunction.

### D.  An Injunction, Based On The Merits Of The Case, Will Result In The Disclosure Of Unclassified Information Thereby No Injury Will Be Suffered By The CIA

Were this Court to rule that Waters is entitled to a preliminary or permanent injunction on the merits with respect to all or part of the relief being sought herein, it would be the equivalent of concluding that the contested information is unclassified. If

the information is unclassified it is inconceivable, and in any event irrelevant, that the CIA would suffer any injury whatsoever. By operation of law, no injury can be imparted to the CIA based on the publication of unclassified information. See Snepp, 444 U.S. at 513 n.8 ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned").

Additionally, in seeking a permanent injunction courts are also to take into consideration the harm that would be caused to other interested parties. Mineta, 319 F. Supp.2d at 87. Clearly the failure to obtain an injunction to ensure Waters' First Amendment rights are protected will negatively harm his publisher, Dutton. As has been made clear by Dutton, every day that the CIA causes delay in having this matter adjudicated and resolved creates significant hardship, primarily financial of course, on it and Waters. See Hoffman Decl. at ¶14.

### III. THE COURT SHOULD NOT ACCEDE TO ANY REQUEST BY THE CIA TO RESOLVE THE CLASSIFICATION ISSUES *EX PARTE* AND INSTEAD PERMIT WATERS' COUNSEL'S ACCESS TO THE WITHHELD PORTIONS OF THE MANUSCRIPT AND THE CIA'S DECLARATIONS

Though this Court should be able to easily resolve the classification decisions on their face in simple order, particularly since the CIA has improperly classified most of the information and the remaining portions are farcically classified, should for whatever reason this Court believe detailed proceedings are in order then Waters' attorney should be permitted to fully participate in that process.

The issue of counsel access to an allegedly classified manuscript was a recently contested matter in this Circuit for the first time in 20 years. Stillman v. DoD, 209 F. Supp. 2d 185 (D.D.C. 2002), rev'd on other grounds, 319 F.3d 546 (D.C.Cir. 2003).[18]

---

[18] Waters' counsel also served as counsel for Stillman.

These two decisions speak for themselves and serve as the guide to this Court as to the appropriate process in addressing the issue of counsel access.

The Honorable Emmet G. Sullivan issued a detailed 106 page opinion as to why he believed the First Amendment required the defendants, which included the CIA, to provide a cleared counsel for Stillman with access to the allegedly classified portions of the manuscript at issue in that case. Stillman, *passim*. Ultimately Judge Sullivan concluded that he "will not allow the government to cloak its violations of plaintiff's First Amendment rights in a blanket of national security." 209 F.Supp.2d at 231.[19]

The D.C. Circuit reversed. It noted that the District Court had "abused its discretion by unnecessarily deciding that a plaintiff has a first amendment right for his attorney to receive access to classified information where such access is needed to assist the court in resolving the plaintiff's challenge to the classification." Stillman, 319 F.3d at 548. The "abuse" arose, according to the Circuit panel, because this Court "did not wait to evaluate the pleadings and affidavits to be submitted by the Government in defense of its classification decision." Id. at 548-49.

The defendants will no doubt submit various declarations *in camera* and *ex parte* as well as some minimalist public version in response to this Motion. After reviewing the defendants' submissions, and if it is determined that Waters' Motion is denied (and especially if the publicly available documents fail to contain any specific references to the withheld information that can rationally be addressed), this Court should respectfully

---

[19] See also Declaration of R. James Woolsey (dated March 13, 2002)("In order to permit a lawful challenge to an agency's classification decisions, an author's attorney, if holding the appropriate security access, must be provided unfettered access to the writing in question (as well as access to his client) and any agency declarations submitted in support of the classification decisions."), attached at Exhibit "31".

"consider whether its need for [Waters' counsel's] assistance outweighs the concomitant intrusion upon the Government's interest in national security" and rule it does thereby ordering the CIA to permit counsel's access to the documents.

## IV. THE CIA SHOULD BE REQUIRED TO SEEK AN INJUNCTION AGAINST PUBLICATION OF WATERS' BOOK IF IT TRULY BELIEVES THE INFORMATION IS CLASSIFIED

In 1985, Admiral Stansfield Turner's book Secrecy and Democracy was published in the aftermath of a very relevant battle with the CIA. Coincidently, Admiral Turner, who served as the Director of the CIA from 1977-1981, had urged then-Attorney General Griffin Bell in 1978 that former CIA officer Frank Snepp should be prosecuted for failing to submit his manuscript for prepublication review. Id. at x. Thus it was nothing less than irony that Admiral Turner would find himself in conflict with the very process he extolled just years before. Although the experience recounted by Admiral Turner occurred more than 20 years ago it would appear obvious that little has changed.

In participating in the CIA's prepublication review process Admiral Turner identified two major problems: timeliness and arbitrariness.[20] It is the latter that deserves further elaboration at this time. The Admiral wrote:

> Arbitrariness stemmed from an administration policy of drawing the line of secrecy on the overcautious side. Though that may seem to be the safest course for the country, it actually endangers secrets by making a mockery of the secret label. Having been responsible for protecting the nation's intelligence secrets for four years, I am well aware what the release of some kinds of information could mean to our national security. In the review of my book, more than one hundred deletions were made by the CIA. These ranged from the borderline issues to the

---

[20] See also "The Consequences of "Pre-publication Review": A Case Study of CIA Censorship of The CIA and the Cult of Intelligence," Center for National Security Studies Report No. 109 at i (September 1983)("Perhaps the most important lesson to be drawn from reviewing the passages censored by the CIA is the arbitrariness of the process and the degree to which classification is in the eye of the beholder.").

ridiculous. I appealed many of these questionable deletions to the higher
levels of the CIA and obtained only three minor concessions.

The extreme arbitrariness of the review process was vividly illustrated in
the last appeal I made. I had given in on most of the deletions demanded
by the CIA, but two requests were particularly egregious and
unnecessary. Anthony Lapham, on my behalf, sent the CIA a letter
stating that unless they either (1) provided me with a convincing reason
for their position, or (2) obtained a court injunction against my
publishing the information, I would proceed to do so. The CIA, after
consulting with the White House and the Department of Justice, chose to
do neither. Instead, they replied that I should do whatever I deemed to be
"appropriate," but that the CIA reserved "the right to take whatever
action it deemed appropriate."

This was the most irresponsible position they could possibly have taken.
The supposed "secrets" were clearly of no importance to them, since
they left it to my discretion whether or not to publish them. The threat to
take me to court after the fact could not have retrieved the secrets. It
could only have exacted retribution, if the government won. Clearly the
administration knew that a court would not have upheld a petition for an
injunction. Their only other recourse was to threaten me.

They resorted to this tactic because they were upset with the book's
highly critical view of the Reagan administration's mishandling of our
intelligence activities, especially its indifference to any oversight of the
CIA. The administration does not believe that anyone should check on
whether even simple decisions of the CIA, such as what authors are
permitted to say, are fair and in the public interest. Yet our entire
constitutional system is built on checks and balances between the
Executive, Legislative, and Judicial branches of our government.
Anthony Lapham's and my objective in suggesting that the government
enjoin publication was to gain the intercession of a third party to
arbitrate the dispute, namely the court.

...The citizens of our country deserve better assurance that their interests
are truly being served by the CIA's review process. As long as there is
almost no check on the arbitrariness of the CIA, it is likely that there will
be further abuses of the public's right to knowledge about its
government.

Id. at x-xii.

The CIA is well aware from the legal precedence it helped create and shape that it has

the authority to seek an injunction against Waters to prevent his publication of *Class 11*.

Indeed, it has threatened Waters that it would were he to actually publish the book

without final approval. Exhibit "24". Yet, notwithstanding the intimidation, to date the CIA has not sought an injunction against publication of the censored items. See Snepp, 444 U.S. at 513 n.8 (distinguishing injunctive proceedings from review of prepublication clearance decisions).

The legal reason is simple. If the CIA did seek judicial action to restrain publication, it would bear a much heavier burden.  Id.; New York Times Co., 403 U.S. at 714; Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963). The Supreme Court has long observed that "the chief purpose of [the first amendment's] guaranty [is] to prevent previous restraints upon publication." Near v. Minnesota, 283 U.S. 697, 713 (1931). Most likely any effort by the CIA to seek such an injunction would fail, and that would speak volumes with respect to the seriousness, if not outright frivolity, of the CIA's alleged classification decisions.

The policy reasons are perhaps simpler. The CIA wishes to place the affirmative burden on its former employees in the hope they would simply go away, or require them to incur the significant expenses that logically follow any litigation effort, which few choose to do.

This Court should respectfully question, just as former DCI Admiral Turner did, just how sensitive this information truly is if the CIA is unwilling to seek to affirmatively protect it and, instead, is willing to allow the information to be publicly released yet remain content with obtaining financial compensation afterwards by pursuing claims asserting nothing more than a contractual violation.

Exactly how does that benefit the national security interests of the United States at the expense of the First Amendment?

## <u>CONCLUSION</u>

Based on the foregoing, this Court should respectfully grant Waters' request for a

preliminary and permanent injunction.

Date:   March 7, 2006

Respectfully submitted,

/s/

_____

Mark S. Zaid, Esq.
DC Bar #440532
Krieger & Zaid, PLLC
1920 N St., N.W.
Suite 300
Washington, D.C. 20036
(202) 454-2809
ZaidMS@aol.com

Attorney for Plaintiff