UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THOMAS WATERS, JR., ) | No. 1:06cv00383-RBW |
| ) | |
| Plaintiff, ) | DEFENDANT'S OPPOSITION TO |
| ) | PLAINTIFF'S MOTION FOR |
| ) | PRELIMINARY AND |
| v. ) | PERMANENT INJUNCTIONS |
| ) | |
| CENTRAL INTELLIGENCE AGENCY, ) | |
| ) | |
| Defendant. ) | |

RECEIVED MAR 17 2006

## PRELIMINARY STATEMENT

Plaintiff, Thomas Waters, Jr., has moved for a preliminary injunction to permit the publication on April 20, 2006, of a manuscript determined by defendant, the Central Intelligence Agency (CIA), to contain classified information. *See* Compl. ¶¶ 28, 30 & prayer ¶ 1. As is shown below, he does not meet the requirements for a preliminary injunction. He does not have a substantial likelihood of success on the merits because the CIA is not estopped from asking him to make further changes to the manuscript and because he has not established a substantial likelihood that the determination of the CIA that the manuscript contains classified information will be invalidated. In addition, the balance of hardships does not favor him because the injunction that he seeks would result in the irrevocable disclosure of information that could jeopardize the CIA's ability to collect intelligence information and conduct intelligence operations and activities in support of the national security and foreign policy of the United States. Accordingly, his motion for a preliminary injunction should be denied.

In addition to moving for a preliminary injunction, plaintiff has moved for a permanent injunction having the same provisions as the preliminary injunction. *See* Compl. prayer ¶ 1;

Mem. Supp't Pl.'s Mem. Perm. Inj. or, Alternatively, Prelim. Inj. (Pl. Mem.) at 18 n.7. In essence, plaintiff's motion is a motion for summary judgment because the motion, if granted, would dispose of this case. Because the time for plaintiff to move for summary judgment has not yet arrived, his motion for a permanent injunction should be denied as premature.

## STATEMENT OF FACTS

Plaintiff joined the CIA in 2002. Compl. ¶ 3. He was an alleged member of the first training class to be held after the terrorist attacks of September 11, 2001. *Id.* ¶ 5. As a condition of his employment by the CIA, he signed a secrecy agreement on July 15, 2002. Ex. A preamble & p. 2.[1] The secrecy agreement provides:

> 5. As a further condition of the special confidence and trust reposed in me by the [CIA], I hereby agree to submit for review by the [CIA] any writing or other preparation in any form, including a work of fiction, which contains any mention of intelligence data or activities, or contains any other material that might be based on [classified information], that I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment or other service with the [CIA] or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to [classified information]. I further agree that I will not take any steps towards public disclosure until I have received written permission to do so from the [CIA].
>
> 6. I understand that the purpose of the review described in paragraph 5 is to give the [CIA] an opportunity to determine whether the information or material that I contemplate disclosing publicly contains any information that I have agreed not to disclose. I further understand that the Agency will act upon my submission and make a response to me in a reasonable period of time.

*Id.* ¶¶ 5, 6.

In March 2004, plaintiffs resigned from the CIA. Compl. ¶ 5. By letter dated May 27, 2004, he submitted a "draft non-fiction manuscript" to the Publications Review Board (PRB), the

---

[1] Except as otherwise noted, references to exhibits are to the exhibits to this memorandum.

component of the CIA that conducts prepublication reviews. *Id.* ¶ 6. The manuscript allegedly contains "unique information regarding [plaintiff's] experiences as a member of the first 9/11 class of CIA recruits." Pl. Mem. at 14.

By letter dated September 1, 2004, plaintiff was advised by the chair of PRB, Paul-Noel Chretien, that the manuscript contained information that was "inappropriate for disclosure in the public domain"; that 55 pages of the manuscript required revision or deletion; and that the manuscript would have to be submitted for "further Agency review" after the required changes had been made. Pl. Mem. ex. 3 at 1, 7. Advising Mr. Chretien that the manuscript had been sent "to a literary agent for review," plaintiff resubmitted "parts of the manuscript" by letter dated September 16, 2004. Ex. B at 1. By letter dated September 20, 2004, plaintiff was advised by Mr. Chretien that changes needed to be made to two of the pages that plaintiff had submitted. Pl. Mem. ex. 6 at 1. Mr. Chretien said:

> After making the changes the Board requires, you must resubmit the manuscript for final Agency review. In lieu of resubmitting the entire manuscript, you may return only the affected pages or you may verify in writing that you have made all the deletions and revisions.

Pl. Mem. ex. 6 at 1, 2.

By letter dated September 20, 2004, plaintiff responded to the letter of Mr. Chretien by telling him: "I believe we are in the final phase, with light at the end of the proverbial tunnel. I'll be sending some new material over tomorrow, but I don't think it's anything that won't past muster quickly." Ex. C. By letter dated December 5, 2004, plaintiff submitted "additional modifications" for review. Compl. ¶ 12. Telling plaintiff that "[we] will begin our review," PRB acknowledged receipt of the modifications by e-mail dated December 6, 2004. Pl. Mem.

3

ex. 9. Unwilling to await completion of the review, plaintiff sold "certain publishing rights in the [manuscript]" to "Dutton, a division of Penguin Group (USA) Inc.," by agreement dated February 4, 2005. *Id.* ex. 30 ¶ 2. "In August 2005, Dutton tentatively scheduled publication of the [manuscript] for March 2006." *Id.* ex. 30 ¶ 6.

Meanwhile, plaintiff had made further changes to the manuscript. Pl. Mem. ex. 30 ¶ 5. On September 27, 2005, he sent those changes to PRB, along with a request for a "fast turn around." *Id.* ex. 10a. By e-mail dated September 28, 2005, he was told the following by PRB:

> We received your faxed pages and will begin our review. Due to the back and forth on your manuscript over a long period of time, we also suggest that after we respond on your last submission, that you email, as a standard WORD attachment, the current, complete manuscript as you have it for a review before the galley stage.

*Id.* ex, 11.

By e-mail dated October 20, 2005, plaintiff asked PRB for a "status update" because, he said, "I've got an agent and publisher pounding on desks." Pl. Mem. ex. 13. Responding by e-mail dated October 21, 2005, PRB said: "All we can report is that it is still under review and that we are pushing for a timely response." *Id.* ex. 14. Providing further information by e-mail dated December 13, 2005, PRB said:

> [W]e are attempting to set-up a meeting with our fellow reviewers in another office to compare notes. When this done, we will compose our response to you. Please note that the unapproved manuscript should not be shared with others until final PRB approval is given and that galley proofs must also be approved before publishing.

*Id.* ex. 15.

Complaining about the length of time that the review process was taking, plaintiff said the following in an e-mail to PRB dated December 30, 2005: "AR-6 places the burden on CIA to

4

respond by a stated deadline, (30 days), the failure of which releases the author from further delay, restrictions, or culpability." Pl. Mem. ex. 19. Disagreeing, PRB said:

> To clarify what our current process and policy is now (and has been substantially the same for the past 10 years or so): the Agency will attempt to review and respond to an author's submission within 30 days. This time limit is an administrative guideline and, depending on the complexity and length of the material, can be longer. This process can be further lengthened when additional re-writes of various segments of the original submission, which includes new material, is serially submitted over a period to time and must be separately handled and reviewed. The long and short of it is that we make every attempt to make the process as efficient and quick as possible, but we may not always meet a 30 day deadline. Our mandate its to ensure that classified information is safeguarded and that process often takes coordination with multiple offices, both internally and externally. In any event, if we exceed the 30 days, there is not an automatic default of approval – you must wait for explicit approval to publish (i.e., share the material with someone else).

*Id.* ¶ 20.

By letter dated February 15, 2006, plaintiff was advised by R. Puhl, the new chair of PRB, that PRB had completed its review of the latest version of the manuscript and had determined, among other things, that changes needed to be made to 155 pages. Pl. Mem. ex. 24 at 1, 2. The changes that plaintiff was asked to make involve "details and specifics on the operational training in the CIA's Clandestine Service Trainee program, information about the CIA's internal organization, functions, and employees, information about cover mechanisms used by the CIA, and descriptions of covert CIA facilities." Ex. D ¶ 8. In the judgment of the CIA, the publication of the manuscript without these changes "would jeopardize the CIA's ability to collect intelligence information and conduct intelligence operations and activities in support of the national security and foreign policy of the United States," thereby causing "serious damage to the national security." *Id.* ¶¶ 8, 18.

On March 3, 2006, plaintiff commenced this action. On March 7, 2006, he served the complaint upon the U.S. Attorney. Alleging that the "cost" to plaintiff will be "no less than $9,000 should a new version of the [manuscript] need to be created," plaintiff seeks "a temporary and/or permanent injunction to block the CIA from restraining the publication of any portions of his manuscript." Am. Compl, ¶ 31 & prayer ¶ 1. The publication of the manuscript is currently scheduled for April 20, 2006. Ex. E.

## ARGUMENT

I. PLAINTIFF DOES NOT MEET THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

The factors relevant to the issuance of a preliminary injunction are whether "(1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). "The test is a flexible one." *Id.* "'If the arguments for one factor are particularly strong, an injunction may be issued even if the arguments in other areas are rather weak.'" *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

In this case, plaintiff does not meet the requirements for a preliminary injunction. He does not have a substantial likelihood of success on the merits because the CIA is not estopped from asking him to make further changes to the manuscript and because he has not established a substantial likelihood that the determination of the CIA that the manuscript contains classified information will be invalidated. In addition, the balance of hardships does not favor him because

the injunction that he seeks would result in the irrevocable disclosure of information that could jeopardize the CIA's ability to collect intelligence information and conduct intelligence operations and activities in support of the national security and foreign policy of the United States. His motion for a preliminary injunction should therefore be denied.

    A.    *Plaintiff Does Not Have a Substantial Likelihood of Success on the Merits.*

        1.    *The CIA Is Not Estopped From Asking Plaintiff to Make Further Changes to the Manuscript.*

The doctrine of estoppel is inapplicable against the government in any case involving "payment from the Treasury." *OPM v. Richmond*, 496 U.S. 414, 434 (1990). Although the Supreme Court has refrained to date from "adopt[ing] 'a flat rule that estoppel may not in any circumstances run against the Government,'" it has held that "the arguments the Government advances for the rule are substantial." *Id.* at 423 (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984)). Because of the "powerful cautions against application of the doctrine to the government" that thus exist, any application of the doctrine to the government must, at the very least, "'be rigid and sparing.'" *Rann v. Chao*, 346 F.3d 192, 197 (D.C. Cir. 2003) (quoting *ATC Petroleum v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988)).

In this case, plaintiff alleges that the letter of Mr. Chretien dated September 20, 2004, gave him leave to publish nearly all of the manuscript as it then existed. Pl. Mem. at 24. Accordingly, he alleges that the CIA is estopped from prohibiting the publication of any material to which Mr. Chretien did not object. *Id.* However, these allegations are without merit even assuming, *arguendo*, that a claim of estoppel can ever be sustained against the government.

At a minimum, a party seeking to estop another party must establish that "there was a 'definite' representation to the party claiming estoppel; that the latter 'relied on its adversary's

7

conduct in such a manner as to change his position for the worse'; and that the reliance was 'reasonable.'" *Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000) (quoting *Heckler*, 467 U.S. at 59). In this case, nothing that Mr. Chretien said in his letter constituted a "'definite' representation" that the time was now ripe for plaintiff to sell his manuscript to a publisher. To the contrary, Mr. Chretien said the following in the letter: "After making the changes the Board requires, *you must resubmit the manuscript for final Agency review.* In lieu of submitting the entire manuscript, you may return only the affected pages or you may verify in writing that you have made all the deletions and revisions." Pl. Mem. ex. 6 at 2 (emphasis supplied). Accordingly, the letter made it clear that no final determination had been made with respect to the suitability of the manuscript for publication. If plaintiff wished to believe otherwise, he did so at his peril.

Nor did plaintiff consider the letter of Mr. Chretien to *be* final approval of the manuscript. To the contrary, he responded to the letter of Mr. Chretien with a letter in which he said: "I believe we are in the final phase, with light at the end of the proverbial tunnel. I'll be sending some new material over tomorrow" Ex. C. Months later, he was still submitting "additional modifications" to PRB. Compl. ¶ 12.

In addition, plaintiff entered into the following covenant when he signed his secrecy agreement: "I further agree that I will not take any steps towards public disclosure [of any material submitted for prepublication review] until I have received written permission to do so from the CIA." Ex. A ¶ 5. Accordingly, plaintiff *knew* that he needed actual written permission before he took "any steps toward public disclosure," and that any permission that he might infer from the course of his dealing with PRB would be insufficient.

8

In view of the foregoing, plaintiff is precluded from alleging that he "'relied on [Mr. Chretien's] conduct in such a manner as to change his position for the worse,'" let alone that "the reliance was 'reasonable.'" *See Grahan*, 222 F.3d at 1007 (quoting *Heckler*, 467 U.S. at 569). Accordingly, his claim of estoppel is without merit.

Taking a different tack, plaintiff alleges that PRB is required to complete a prepublication review within 30 days and that a person who submits material to be reviewed is entitled to conclude that the CIA has "no concerns regarding the submitted information" if that deadline is not met. Pl. Mem. at 28. Accordingly, he alleges that "[t]he CIA is estopped from preventing [him] from publishing any text submitted after December 2004." *Id.* at 25 (capitalization deleted).

However, PRB is not required to complete a prepublication review within 30 days. The completion of a review within that time frame is a goal, not a requirement. As the regulations of the CIA provide:

> As a general rule, the PRB will compete prepublication review for nonofficial publications within 30 days of receipt of the material. Relatively short, time-sensitive submissions (for example, op-ed pieces, letters to the editor, and so forth) will be handled as expeditiously as practicable. Lengthy or complex submissions may require a longer period of time for review, especially if they involve intelligence sources and methods issues.

Ex. F § 2(d)(4) (dated July 27, 2005).

Alleging that the existence of a 30-day deadline should be presumed to exist, plaintiff refers to an article in which John Hollister Hedley, then the chair of PRB, said the following:

> The courts * * * have noted that the secrecy agreement is a prior restraint of First Amendment freedom. But they ruled it a legitimate restraint, provided it is limited to the deletion of classified information and so long as a review of a proposed publication is conducted and a response given to its author within 30 days.

9

Hedley, *Secrets, Free Speech, and Fig Leaves*, Studies in Intelligence, Spring 1998, at 75, 76 (quoted at Pl. Mem. at 27).

In addition, plaintiff refers to a set of briefing slides entitled "Prepublication Review: Your Rights and Responsibilities" that Mr. Chretien allegedly used in 2003 to "explain the PRB process to CIA employees." Pl. Mem. at 26 & ex. 21 at 1. Captioned "The First Amendment Balancing Act," one slide said: "Court authorization of 'prior restraint' with 30 days for review and response to author." *Id.* ex. 21 at 3. Captioned "Process Summary," another slide said: "Author submits manuscript" and "PRB has 30 days to complete review." *Id.*

Nothing that Mr. Hedley said in his article or that Mr. Chretien said in his briefing slides was, or is, binding on the CIA. To the contrary, their statements were "general statements of policy," i.e., "'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978) (quoting *Attorney General's Manual on the Administrative Procedure Act* 30 n.3 (1947)). A general statement of policy "'does not establish a binding norm'" because "'[i]t is not finally determinative of the issues or rights to which it is addressed.'" *Guardian*, 589 F.2d at 666 (quoting *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974) (internal quotation omitted)).

Furthermore, neither Mr. Hedley nor Mr. Chretien stated that a person who submitted material for prepublication review was entitled to conclude that the CIA had "no concerns regarding the submitted information" if PRB did not complete its review within 30 days. *See* Pl. Mem. at 28. Nor would plaintiff have been entitled to rely on any such statement. When plaintiff signed his secrecy agreement, he made the following representation: "I further

10

understand that the Agency will act upon my submission and make a response to me in a reasonable period of time." Ex. A ¶ 6. Accordingly, plaintiff knew that no 30-day deadline existed for the completion of prepublication reviews. Nor did he rely on the existence of any such alleged deadline. To the contrary, he continued to submit new material for review notwithstanding the existence of the alleged deadline. *See* Ex. B at 1; Compl. ¶ 12; Pl. Mem. ex. 10a. His claim of estoppel should therefore be rejected even assuming, *arguendo*, that any such claim can ever be asserted against the United States.

> 2. *Plaintiff Has Not Established a Substantial Likelihood That the Determination of the CIA That the Manuscript Contains Classified Information Will Be Invalidated.*

"'[T]he Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of [the disclosure of] a particular classified record.'" *McGehee v. CIA*, 718 F.2d 1137, 1148 (D.C. Cir. 1983) (quoting S. Conf. Rep. No. 93-1200, at 12 (1974)); *accord Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003). Accordingly, "in reviewing whether specified information reasonably could be expected to cause actual serious harm if divulged, courts should accord deference to the CIA's reasoned explanation of its classification decision." *McGehee*, 718 F.2d at 1140. Because the judiciary "cannot second-guess CIA judgments on matters in which [it] lacks the requisite expertise," all that is required is that the CIA provide explanations to the court demonstrating with "reasonable specificity" a "logical connection between the deleted information and the reasons for classification." *Id.* at 1148.

In this case, plaintiff expresses "confiden[ce]that this Court will categorically reject the majority" of the changes to the manuscript that he has been asked to make "on the basis of

11

absurdity alone." Pl. Mem. at 30. However, plaintiff acknowledges that he is unable at this time "to further justify his position." *Id.* Still less does he provide any basis for concluding that he will be able at any time to overcome the deference to which "the CIA's reasoned explanation of its classification decision[s]" will be entitled. *See McGehee*, 718 F.2d at 1140. Accordingly, he provides no basis for concluding that he has "a substantial likelihood of success on the merits." *See CSX Transp.*, 406 F.3d at 670.

Indeed, the most that plaintiff suggests is that he *may* be able to establish a substantial likelihood of success on the merits if his attorney is granted access to the unredacted manuscript. Pl. Mem. at 35. However, this Court may not consider the issue of granting plaintiff's attorney access to the manuscript until it "first inspect[s] the manuscript and consider[s] any pleadings and declarations filed by the Government, as well as any materials filed by [plaintiff]." *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003). Even assuming, *arguendo*, that the issue of granting access were appropriate for consideration at this time, plaintiff's attorney is not "'an expert in classification and declassification.'" *See id.* at 549. Nor may any such expertise be inferred from the "'limited security access approval'" that he has been granted by the CIA in certain previous cases. *See* Pl. Mem. at 16. "Limited security access approval" permits an attorney to be provided access to certain specific pieces of classified information for which, in the judgment of the CIA, he or she has a "need to know." Access to other pieces of information is not permitted. Accordingly, plaintiff is mistaken when he suggests that the "limited security access approval" that his attorney has been granted in other cases is "essentially" a Top Secret security clearance. *See id.* at 16 n.5.

Even assuming, *arguendo*, that plaintiff's attorney did possess the equivalent of a security clearance, that fact would merely mean that he was eligible for access to classified information if access was otherwise appropriate. *See* Exec. Order No. 12958, § 4.1(a). However, his views about the suitability of particular pieces of information for classification would not be entitled to any particular weight. In *Snepp v. CIA*, 444 U.S. 507 (1980), the Supreme Court said: "When a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA – with its broader understanding of what may expose classified information and confidential sources – could have identified as harmful." 444 U.S. at 512. If, as *Snepp* indicates, the judgment of a former agent is irrelevant in the prepublication review context, even more irrelevant is the judgment in that context of an attorney who merely *represents* former agents.

    B.    *The Balance of Hardships Does Not Favor Plaintiff Because the Injunction That He Seeks Would Result in the Irrevocable Disclosure of Information That Could Jeopardize the CIA's Ability to Collect Intelligence Information and Conduct Intelligence Operations and Activities in Support of the National Security and Foreign Policy of the United States.*

Plaintiff alleges that he is entitled under the First Amendment to publish his manuscript without making the changes that he has been asked to make and that, accordingly, the request that he make those changes threatens him with injury sufficient to warrant a preliminary injunction. Pl. Mem. at 32-33. However, this allegation presupposes the existence of a right that plaintiff does not have. "If the Government classified the information properly, then [plaintiff] simply as no first amendment right to publish it." *Stillman*, 319 F.3d at 548.

In addition, plaintiff ignores the fact that "'irreparable injury is suffered when monetary damages are difficult to ascertain or inadequate.'" *CSX Transp.*, 406 F.3d at 673 (quoting

*Danielson v. Local 275*, 479 F.2d 1033, 1037 (2nd Cir. 1973)). In this case, plaintiff alleges that he will suffer damages amounting to "no less than $9,000 should a new version of the [manuscript] need to be created." Compl. ¶ 31. Accordingly, this is not a case in which the amount of alleged damages is "'difficult to ascertain or inadequate.'" *See CSX Transp.*, 406 F.3d at 673 (quoting *Danielson*, 479 F.2d at 1037). In view of this fact, plaintiff is not entitled to the preliminary injunction that he seeks.

Plaintiff also ignores the injury that the public will sustain if he is permitted to publish the manuscript without making the requested changes. Plaintiff expresses "confiden[ce]" that the Court will reject "the majority" of those changes. Pl. Mem. at 30. By doing so, he acknowledges that at least some of those changes involve information the disclosure of which "could be expected to cause serious damage to the national security." *See* Ex. D ¶ 8. "The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service'" *Stillman*, 319 F.3d at 548 (quoting *Snepp*, 444 U.S. at 510 n.3); *accord McGehee*, 718 F.2d at 1143. An interest of "vital importance" can justify a "significant impairment of First Amendment rights." *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (plurality op.). Accordingly, the interest that the public has in avoiding the publication of information the disclosure of which could "jeopardize the CIA's ability to collect intelligence operations and activities in support of the national security and foreign policy of the United States" is at least as strong as the interest that plaintiff has in publishing his manuscript "as is." *See* Ex. D ¶ 18.

In *Providence Journal Co. v. FBI*, 595 F.2d 889 (1st Cir. 1979), an order directing the disclosure of certain documents was stayed pending appeal because, "[o]nce the documents are

surrendered pursuant to the lower court's order, confidentiality will be lost for all time. The status quo could never be restored." 595 F.2d at 890. In this case, plaintiff's motion for a preliminary injunction presents the same scenario. As plaintiff says:

> In this case a preliminary injunction would be tantamount to a permanent one as such relief would provide a green light to publication. Obviously once publication transpires the genie is let out of the bottle and cannot be placed back in, which would moot any later reconsideration.

Pl. Mem. at 18 n.7.

Plaintiff seeks leave to publish a manuscript that allegedly contains "unique information." Pl. Mem. at 14. He acknowledges that portions of the manuscript have never been "cleared" by the CIA. *Id.* ex. 24 at 1-2. Under these circumstances, the Court should not "let the genie out of the bottle" until it assures itself that the publication of the manuscript without the changes that the CIA has requested will not result in the disclosure of "'information important to our national security.'" *Stillman*, 319 F.3d at 548 (quoting *Snepp*, 444 U.S. at 510 n.3). Plaintiff's motion for a preliminary injunction should therefore be denied.

II.   BECAUSE THE TIME FOR PLAINTIFF TO MOVE FOR SUMMARY JUDGMENT HAS NOT YET ARRIVED, HIS MOTION FOR A PERMANENT INJUNCTION SHOULD BE DENIED AS PREMATURE.

Motions for summary judgment "dispose of cases." *See Battista v. Horton, Meyers & Raymond*, 128 F.2d 29, 30 (D.C. Cir. 1942). In this case, plaintiff moves for a permanent injunction that would convert the "preliminary judgment" that he seeks "into a permanent one." *See* Pl. Mem. at 18 n.7. Accordingly, plaintiff's motion for a permanent injunction is a motion for summary judgment because its granting would "dispose of [this] case[]." *See Battista*, 128 F.2d at 30.

Fed. R. Civ. P. 56(a) provides that a plaintiff may move for summary judgment "at any time after the expiration of 20 days from the commencement of the action." The reference to 20 days is intended to reflect the time allowed for answering a complaint. Fed. R. Civ. P. 56, Adv. Comm. Notes, 1946 Amdt., Note to Subdiv. (a). However, an agency of the United States is allowed 60 days to answer a complaint, not 20. Fed. R. Civ. P. 12(a)(3)(A). Accordingly, Rule 56(a) is properly read in an action against the government as prohibiting the plaintiff from filing a motion for summary judgment until, at the earliest, 60 days from the date upon which the U.S. Attorney has been served with the complaint. In addition, "the service of preliminary motions of any kind will prolong that period even further." Fed. R. Civ. P. 56, Adv. Comm. Notes, 1946 Amdt., Note to Subdiv. (a).

In this case, plaintiff sues a federal agency and has served a preliminary motion. The U.S. Attorney was not served with the complaint until March 7, 2006. The motion for a permanent injunction that plaintiff has filed is tantamount to a motion for summary judgment because its granting would dispose of this case. Accordingly, the motion for a permanent injunction should be denied as premature under Rule 56(a).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for preliminary and permanent injunctions should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General
KENNETH L. WAINSTEIN
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director

                                                        /s/ David M. Glass
                                        DAVID M. GLASS, DC Bar 544549
                                        Attorney, Department of Justice
                                        20 Mass. Ave., N.W., Room 7140
                                        Washington, D.C. 20530
                                        Tel: (202) 514-4469/Fax: (202) 616-8470
                                        E-mail: david.glass@usdoj.gov
Dated: March 17, 2006                     Attorneys for Defendant