UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THOMAS WATERS, JR., | ) | No. 1:06cv00383-RBW |
|  | ) |  |
|  | ) | EXHIBITS TO DEFENDANT'S |
| Plaintiff, | ) | OPPOSITION TO PLAINTIFF'S |
|  | ) | MOTION FOR PRELIMINARY |
| v. | ) | AND PERMANENT |
|  | ) | INJUNCTIONS |
| CENTRAL INTELLIGENCE AGENCY, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## CONTENTS

Ex. A          Secrecy agreement of plaintiff (July 15, 2002)

Ex. B          Letter plaintiff to Chretien (Sept. 16, 2004)

Ex. C          Letter plaintiff to Chretien (Sept. 20, 2004)

Ex. D.         Dorn declaration

Ex. E          E-mail Zaid to Glass (Mar. 17, 2006)

Ex. F          Regulation captioned "Agency Prepublication Review of Certain Material
               Prepared for Public Dissemination" (July 22, 2005)

*Waters v. CIA*, No. 1:06cv00383-RBW
Def.'s Opp'n Pl.'s Mot. Prelim. & Perm. Injs.
Ex. A

SECRETARY AGREEMENT

# SECRECY AGREEMENT

1. I, Thomas J. Waters Jr. (print full name), hereby agree to accept as a prior condition of my being employed by, or otherwise retained to perform services for, the Central Intelligence Agency, or for staff elements of the Director of Central Intelligence (hereinafter collectively referred to as the "Central Intelligence Agency"), the obligations contained in this agreement.

2. I understand that in the course of my employment or other service with the Central Intelligence Agency I may be given access to information or material that is classified or is in the process of a classification determination in accordance with the standards set forth in Executive Order 12958 as amended or superceded, or other applicable Executive order, that if disclosed in an unauthorized manner would jeopardize intelligence activities of the United States Government. I accept that being granted access to such information or material I will be placed in a position of special confidence and trust and become obligated to protect the information and/or material from unauthorized disclosure.

3. In consideration of being employed or otherwise retained to provide services to the Central Intelligence Agency, I hereby agree that I will never disclose in any form or manner, to any person not authorized by the Central Intelligence Agency to receive it, any information or material in either of the following categories:

a. information or material received or obtained in the course of my employment or other service with the Central Intelligence Agency that is marked as classified or that I know is classified.

b. information or material received or obtained in the coourse of my employment or other service with the Central Intelligence Agency that I know is in the process of a classification determination.

4. I understand that it is my responsibility to consult with appropriate management authorities in the component or Directorate that employys me or has retained my services, or with the Central Intelligence Agency's Publications Review Board if I am no longer employed or associated with the Agency, in order to ensure that I know 1) whether information or material within my knowledge or control that I have reason to believe might be in either of these categories set forth in paragraph 3 is considered by the Central Intelligence Agency to fit in either of those categories; and 2) whom the Agency has authorized to receive such information or material.

5. As a further condition of the special confidence and trust reposed in me by the Central Intelligence Agency, I hereby agree to submit for review by the Central Intelligence Agency any writing or other preparation in any form, including a work of fiction, which contains any mention of intelligence data or activities, or contains any other information or material that might be based on either of the categories set forth in paragraph 3, that I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment or other service with the Central Intelligence Agency or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to the categories set forth in paragraph 3. I further agree that I will not take any steps towards public disclosure until I have received written permission to do so from the Central Intelligence Agency.

6. I understand that the purpose of the review described in paragraph 5 is to give the Central Intelligence Agency an opportunity to determine whether the information or material that I contemplate disclosing publicly contains any information or material that I have agreed not to disclose. I further understand that the Agency will act upon my submission and make a response to me in a reasonable period of time. I further understand that if I dispute the Agency's initial determination on the basis that the information or material in question derives from public sources, I may be called upon to specifically identify such sources. My failure or refusal to do so may by itself result in denial of permission to publish or otherwise disclose the information or material in dispute.

7. I understand that all information or material that I may acquire in the course of my employment or other service with the Central Intelligence Agency that fits either of the categories set forth in paragraph 3 of this agreement are and will remain the property of the United States Government unless and until otherwise determined by an appropriate official or final ruling of a court of law. I agree to surrender anything constituting, containing or reflecting such information or material upon demand by an appropriate official of the Central Intelligence Agency, or upon conclusion of my employment or other service with the Central Intelligence Agency.

8. I agree to notify the Central Intelligence Agency immediately in the event that I am called upon by judicial or congressional authorities, or by specially established investigatory bodies of the executive branch, to testify about, or provide, information or material that I have agreed herein not to disclose. In any communication with any such authority or body, I shall observe all applicable rules or procedures for ensuring that such information and/or material is handled in a secure manner.

9. I understand that nothing contained in this agreement prohibits me from reporting intelligence activities that I consider to be unlawful or improper directly to the Intelligence Oversight Board established by the President, or to any successor body that the President may establish, or to the Select Committee on Intelligence of the House of Representatives or the Senate. I recognize that there are also established procedures for bringing such matters to the attention of the Agency's Inspector General or to the Director of Central Intelligence. In making any report referred to in this paragraph, I will observe all applicable rules or procedures for ensuring the secure handling of any information or material that may be involved. I understand that any such information or material continues to be subject to this agreement for all other purposes and that such reporting does not constitute public disclosure or declassification of that information or material.



OBSOLETE PREVIOUS
EDITIONS

10.  I understand that any breach of this agreement by me may result in the Central Intelligence Agency taking administrative action against me, which can include temporary loss of pay or termination of my employment or other service with the Central Intelligence Agency.  I also understand that if I violate the terms of this agreement, the United States Government may institute a civil proceeding to seek compensatory damages or other appropriate relief.  Further, I understand that the disclosure of information that I have agreed herein not to disclose can, in some circumstances, constitute a criminal offense.

11.  I understand that the United States Government may, prior to any unauthorized disclosure that is threatened by me, choose to apply to any appropriate court for an order enforcing this agreement.  Nothing in this agreement constitutes a waiver on the part of the United States to institute a civil or criminal proceeding for any breach in this agreement by me.  Nothing in this agreement constitutes a waiver on my part of any possible defenses I may have in connection with either civil or criminal proceedings that may be brought against me.

12.  In additional to any other remedy to which the United States Government may be become entitled, I hereby assign to the United States Government all rights, title, and interest in any and all royalties, renumerations and emoluments that have resulted or will result or may result from any divulgence, publication or revelation of information or material by me that is carried out in breach of paragraph 5 of this agreement or that involves information or material prohibited from disclosure by the terms of this agreement.

13.  I understand and accept that, unless I am provided a written release from this agreement or any portion of it by the Director of Central Intelligence or the Director's representative, all the conditions and obligations accepted by me in this agreement apply both during my employment or other service with the Central Intelligence Agency, and at all times thereafter.

14.  I understand that the purpose of this agreement is to implement the responsibilities of the Director of Central Intelligence, particularly the responsibility to protect intelligence sources and methods, as specified in the National Security Act of 1947, as amended.

15.  These restrictions are consistent with and do not supersede conflict with or otherwise alter the employee obligations rights or liabilities created by Executive Order 12958, section 7211 of title 5, United States Code (governing disclosure to Congress); section 1034 of title 10, United States Code, as amended by the Militray Whistleblower Protection Act (governing disclosure to Congress by members of the Military); section 2302(b)(8) of title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C., 421 et seq.)(governing disclosures that could expose confidential Government agents) and the statutes which protect against disclosure that may compromise the national security, including section 641, 793, 794, 798, and 952 of title 18, United States Code, and section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. section 783(b)).  The definitions, requirements, obligation, rights, sanctions and liabilities created by said Executive Order and listed statutes are incorporated in this Agreement and are controlling.

16.  I understand that nothing in this agreement limits or otherwise affects any provision of criminal or other law that may be applicable to the unauthorized disclosure of classified information, including the espionage laws (sections 793, 794 and 798 of title 18, United States Code) and the Intelligence Identities Protection Act of 1982 (P.L. 97-200; 50 U.S.C., 421 et seq.).

17.  Each of the numbered paragraphs and lettered subparagraphs of this agreement is severable.  If a court should find any of the paragraphs or subparagraphs of this agreement to be unenforceable, I understand that all remaining provisions will continue in full force.

18.  I make this agreement in good faith and with no purpose of evasion.

19.  This agreement shall be interpreted under and in conformance with the law of the United States.

_____
Signature

_7-15-02_
Date

The execution of this agreement was witnessed by the undersigned, who accepted it on behalf of the Central Intelligence Agency as a prior condition of the employment or other service of the person whose signature appears above.

WITNESS AND ACCEPTANCE:

*Waters v. CIA*, No. 1:06cv00383-RBW
Def.'s Opp'n Pl.'s Mot. Prelim. & Perm. Injs.
Ex. B

September 16, 2004

Central Intelligence Agency
Mr. Paul-Noel Chretien
Chairman, Publication Review Board
█████████
Washington DC, 20505

Dear Paul,

I received your 1 September 2004 fax with the redactions on my manuscript entitled *Class 11: America Responds to September 11*. Per our phone conversations I am resubmitting parts of the manuscript for your review.

All of the sections outlined in your memo were dropped or changed prior to sending the manuscript to a literary agent for review. The references to my previous cover provider and their overseas facilities were replaced with the suggestions you made. These changes represent the majority of the redactions outlined.

As we discussed there were other redacted sections that were derived from public sources. I'll address these sections first. They are listed as follows:

1. Page 3 of your 1 September note: Manuscript page 31, lines 39-40. The source is the Sunday, August 18, 2002 issue of Parade Magazine. A copy is enclosed with relevant sections highlighted.

2. Page 4 of your 1 September note: Manuscript page 77, lines 28-30. Source is a FBI/DOJ news release
   A downloaded copy is enclosed with relevant section highlighted.

3. Page 6 of your 1 September note: Manuscript page 172, lines 41-44. Source is the article *"In the Mind of Judas"*, published in Competitive Intelligence Review, Vol. 9 - 1998, pages 9-14. Please note that I am the author of this piece, published four years before I joined the Agency. A copy is enclosed for your review.

4. Page 6 of your 1 September note: Manuscript page 173, lines 21-37. Source is the same article published in Competitive Intelligence Review in 1998.

The next areas I request reconsideration are sections we discussed by phone where individual paragraphs were redacted. I assume this is due to detail or the perception such exercises are not in the public domain. I have amended these sections and offer the following source references for review by the board.

1. Page 3 of your 1 September note: Manuscript page 56, lines 27-40. Lines 28-30 stating the premise of how an SDR works have been removed. Lines 31-36, paragraph 2, have been reworded. Lines 37-41 have been removed. The new page is enclosed.

2. Page 3 of your 1 September note: Manuscript page 57, lines 16-31. Line 16-23 referencing foreign services in Washington have been dropped. Lines 24-26 have been reworded, simply using 'right' or 'left' to indicate direction. These are also changed in later sections of the same page. Lines 27-31 regarding a radio repeater have been removed.

3. Page 3 of your 1 September note: Manuscript page 70, lines 7-46, all of page 71, and lines 1-39 on page 72, and all of page 74. Tony Mendez wrote about interrogations, airport exfiltrations, and slipping through checkpoints via deception in his book "The Master of Disguise". Please see pages 198-199. Preparing a cover legend, alias docs, and travel itinerary are on page 262. Hostile border crossings are also prominently featured in the CIA endorsed Showtime original movie "In the Company of Spies" (1999), staring Clancy Brown, Tom Berenger, and Ron Silver. Two scenes of interrogation, including one where the officer successfully defends his cover under intense interrogation, are featured in the film.

4. Page 5 of your 1 September note: Manuscript page 129 through 131. This exercise was also reflective of a scene in the film "In the Company of Spies". I did not actually strip down and use a bra in the exercise. But I think it's a better story to recycle the scene from the movie than reveal the preferred training response.

I think this addresses most of the areas I felt strongly about including. I have a small amount of new material I will send in separately, as well as some graphics for PRB review. I understand how much work you guys have each day and appreciate the time devoted to my stuff. With luck, we'll get this completely finished in the next week or two.

Best wishes,

Thomas Waters Jr.

*Waters v. CIA*, No. 1:06cv00383-RBW
Def.'s Opp'n Pl.'s Mot. Prelim. & Perm. Injs.
Ex. C

September 20, 2004

Central Intelligence Agency
Mr. Paul-Noel Chretien
Chairman, Publication Review Board
███████████████
Washington DC, 20505

Dear Paul,

I am in receipt of the redacted pages you faxed over this afternoon. I understand the implications of the word you highlighted and completely agree with its removal. All four instances will be taken out and replaced with 'station', 'office', or a similarly innocuous reference used previously. I apologize for not catching it before sending the section to you.

As always I am most grateful for the speed with which you and your staff have worked on my manuscript. I believe we are in the final phase, with light at the end of the proverbial tunnel. I'll be sending some new material over tomorrow, but I don't think it's anything that won't past muster quickly. I'll also ensure I'm not using the above referenced word anymore!!

Again, my sincere thanks,

Best wishes,

Thomas Waters Jr.

*Waters v. CIA*, No. 1:06cv00383-RBW
Def.'s Opp'n Pl.'s Mot. Prelim. & Perm. Injs.
Ex. D

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

THOMAS WATERS, JR.                    )
                                      )
          Plaintiff,                  )
                                      )  Civ. No. 06-383(RBW)
     v.                               )
                                      )
CENTRAL INTELLIGENCE AGENCY,          )
                                      )
          Defendant.                  )
_____)

## DECLARATION OF MARILYN A. DORN,
### INFORMATION REVIEW OFFICER, NATIONAL CLANDESTINE
### SERVICE, CENTRAL INTELLIGENCE AGENCY

I, MARILYN A. DORN, hereby declare and say:

1.  I am the Information Review Officer (IRO) for the
National Clandestine Service (NCS) of the Central
Intelligence Agency (CIA). After serving 18 months as
Associate IRO, I was appointed to my current position on
1 August 2003. I have held operational and executive
positions with the CIA since 1980.

2.  The NCS is the organization within the CIA
responsible for the clandestine collection of foreign
intelligence from human sources. As NCS/IRO, I am
responsible for the review of documents containing
information originated by the NCS or otherwise implicating
NCS interests. As part of my official duties, I ensure
that the release or withholding of NCS information in CIA

documents is proper and does not jeopardize CIA interests, personnel or facilities and, on behalf of the Director of the Central Intelligence Agency, does not jeopardize intelligence activities or intelligence sources and methods.

3.   As a senior CIA official and under a written delegation of authority pursuant to Executive Order 12958, § 1.3(c), as amended,[1] I hold original classification authority at the TOP SECRET level. Therefore, I am authorized to conduct classification reviews and to make original classification and declassification decisions.

4.   Through the exercise of my official duties, I have become familiar with the above-captioned litigation and the manuscript Plaintiff submitted, pursuant to his secrecy agreements, to the CIA for a prepublication review. I make the following statements based upon my personal knowledge, and information made available to me in my official capacity.

5.   I understand that Plaintiff is seeking a preliminary and/or permanent injunction against the CIA that would allow him to publish his manuscript in its

---

[1]   Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. See, Exec. Order No. 12958, 3 C.F.R. 333 (1995), reprinted as amended in 50 U.S.C.A. § 435 note at 91 (Supp. 2004).

2

entirety.  I am submitting this declaration to describe to the Court the harm to the national security interests of the United States that would result from the granting of a preliminary injunction that allowed disclosure of the classified information in the manuscript.  Because the harm arises from the public disclosure of classified information, this harm cannot be remedied if the Court later finds that Plaintiff's claims have no merit.

6.   Although I can only provide limited information on the classified information redacted from the manuscript both because this is an unclassified declaration and because of the expedited briefing schedule, I can discuss generally the type of information at issue in the manuscript, and the harms that will result from its disclosure.[2]

## Plaintiff's Manuscript

7.   According to Plaintiff, his manuscript, titled Class-11:  Inside the CIA's Post 9-11 Spy Class, is based on his experiences in the first Clandestine Service Trainee

---

[2] As part of his Motion for a Permanent Injunction, or, Alternatively, for Preliminary Injunction, Plaintiff attaches his correspondence with the PRB, including his document submissions.  Although Plaintiff has an obligation by virtue of his Secrecy Agreement to submit all materials that contain references to intelligence data or activities for prepublication review and approval before disclosing them to anyone, he did not submit these letters for prepublication review or approval before filing them with this court.  To prevent the inadvertent disclosure of classified information, Defendant asks this Court to maintain these documents under seal until Defendant has the opportunity to review them and redact any classified information.

3

class to be recruited by the CIA after the terrorist
attacks of September 11, 2001. See Pl. Mem. ex. 2. As
described in various materials that the Plaintiff filed
under seal, Plaintiff's manuscript details the operational
training he underwent during his two years at the CIA.

8.     After reviewing the most recent draft of the
manuscript, I have determined that it contains information
that is currently and properly classified pursuant to
Executive Order 12958, as amended, as its disclosure
reasonably could be expected to cause serious damage to the
national security; and that information, if released, could
reasonably be expected to lead to the unauthorized
disclosure of intelligence sources and methods that must be
protected from unauthorized disclosure, in accordance with
50 U.S.C. §§ 403-1(i) and 403g. These classified facts
include details and specifics on the operational training
in the CIA's Clandestine Service Trainee program,
information about the CIA's internal organization,
functions, and employees, information about cover
mechanisms used by the CIA, and descriptions of covert CIA
facilities.

**Damage from Publication**

9.     The CIA is charged with collecting, processing,
analyzing, producing and disseminating foreign intelligence

4

and counterintelligence, and performing other functions and activities related to foreign intelligence and national security as the President or Director of National Intelligence may direct. The Clandestine Service Trainee (CST) Program is the operational training program for the core collectors who clandestinely gather the foreign information needed by policymakers to make critical foreign policy decisions. Plaintiff's book discusses the operational training for covert CIA employees who collect foreign intelligence from clandestine human intelligence sources, as well as the individuals who completed and conducted that training during the time that Plaintiff was employed by the CIA. As outlined above, I will discuss the harm arising from disclosure of the redacted information that could identify (1) specific facts relating to CIA operational training, (2) CIA employees, or their organization or functions, (3) cover mechanisms employed by the CIA, and (4) the location of CIA training facilities.

10. *CIA Operational training.* Information about operational CIA training, and CST training in particular, is information about how CIA teaches its employees to conduct the business of intelligence collection. Because employees who undergo CST training are the employees who will actually collect intelligence from clandestine human

5

sources, a description of the details of that training necessarily reveals the intelligence methods used by the CIA to conduct intelligence activities. This information on intelligence methods must be protected under Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, codified at 50 U.S.C. § 403-1(i), and Section 6 of the CIA Act, codified at 50 U.S.C. § 403g.

11. To be effective, CIA must guard against the release of even seemingly innocuous information that tends to reveal its intelligence methods. This is true because foreign intelligence services, terrorist groups, and other entities that bear ill will toward the United States have a great interest in knowing the CIA's capabilities and methods. Many of these hostile organizations have both the motivation and resources necessary to analyze any information that is in the public domain in an attempt to decipher CIA's intelligence methods. CIA experience has consistently determined over the years that what may seem trivial to the uninformed, may appear to be of great significance to one who has a broad view of the scene and may put the questioned item of information in its proper context.

12. Disclosing details about CIA's CST training would be of material assistance to those who would seek to

6

penetrate, detect, prevent, or damage the intelligence
operations of the United States. The disclosure of
descriptions of training in the CST program would reveal to
foreign services precisely what collection techniques and
capabilities to guard against, how to assign their limited
counterintelligence resources, and how to avoid detection.
Future CIA intelligence collection operations would be made
more difficult by such a revelation and, as a result, the
conduct of such operations would become even more
dangerous. In addition, to the extent such methods were
exposed or compromised, replacements would have to be
designed and implemented at considerable CIA time, risk,
and expense. As the CIA's overall capacity to effectively
collect information diminished, our ability to protect U.S.
national security interests would correspondingly decline.
Given the harm to national security that may result from
disclosure of information about CIA training, there is
clearly a public interest in not ordering release of the
unredacted manuscript.

    13. *Organization, functions, and identifying
information of CIA employees.* The CIA redacted information
from Plaintiff's manuscript that would tend to identify CIA
employees and their organization and functions. This
information could be analyzed by hostile intelligence

7

services to acquire insights into CIA systems and
procedures and identify the area and scope of their
intelligence operations. This information also could be
used as a tool for hostile penetration or manipulation of
the CIA. For instance, such information would allow a
hostile intelligence service to acquire or confirm data
leading to a fuller understanding of the organization and
staffing of the CIA. The disclosure of such information
could reasonably be expected to cause serious damage to
U.S. national security.

14. Moreover, the CIA does not routinely disclose
the identity and affiliation of its employees. Such
employees may have in the past served under cover or in
sensitive positions or operations, may be doing so now, or
may do so in the future. Revelation of identifying facts
that could associate these individuals with the CIA could
compromise past, present, or future intelligence operations
or activities, identify them as targets for recruitment by
hostile intelligence services, impair the usefulness of
such individuals to the CIA, or place their lives, the
lives of members of their families, and the lives of
intelligence sources they have worked with, in jeopardy.
Because of the risk posed by disclosure of information that
tends to identify CIA employees, the CIA protects that

8

information as intelligence sources and methods under 50 U.S.C. §§ 403-1(i) and as the "organization, functions, names, official titles, salaries or number of personnel" under 50 U.S.C. § 403g.

15.    *Cover mechanisms.* The CIA also redacted certain information about the cover mechanisms used to avoid public affiliation with the CIA. In order for CIA officers effectively to collect intelligence around the world, they cannot openly admit that they work for CIA. Consequently, in carrying out its statutory mission of gathering and disseminating intelligence information, the CIA must employ a variety of cover mechanisms to conceal the true affiliation of its employees who are involved in collecting intelligence information or conducting intelligence operations by clandestine means. A CIA officer's cover protects him in current and future assignments; it also protects the security of past intelligence operations in which the officer has been engaged, and future intelligence operations in which the officer will engage.

16.    The purpose of cover is to provide a believable, non-threatening reason for a CIA officer to move around and meet individuals of intelligence interest to the United States, and to do so without attracting undue attention. Disclosure of official cover mechanisms would expose and

9

officially confirm those mechanisms, hindering the
effectiveness of the official cover program for ongoing and
future intelligence-gathering operations. These cover
mechanisms are protected from disclosure under 50 U.S.C. §§
403-1(i) and 403g.

17.    *Location of training facilities.* In its
unredacted form, Plaintiff's book also reveals identifying
information about certain covert CIA facilities. Revealing
information that might disclose the location of such
facilities would degrade the effectiveness of the facility
to accomplishing its mission, thereby eroding the
intelligence collection capabilities of CIA. At a minimum,
the revelation of a particular facility would permit
hostile intelligence services to refine their targeting and
could reasonably be expected to allow these services to
identify some or all of the covert CIA officers stationed
there. Given these potential harms to intelligence
methods, information about covert CIA facilities is
protected from disclosure under 50 U.S.C. §§ 403-1(i) and
403g.

18.    In conclusion, it is my considered judgment that
the manuscript contains information that is currently and
properly classified and that the manuscript's disclosure in
an unredacted form would harm the national security.

10

Publication of the book without redaction would reveal CIA

methods and would jeopardize the CIA's ability to collect

intelligence information and to conduct intelligence

operations and activities in support of the national

security and foreign policy of the United States. Because

of the irreparable harm to the national security of the

United States that would result from disclosure of the

unredacted manuscript, it is clearly in the public interest

not to grant an injunction ordering disclosure of the

information.

    I declare under penalty of perjury that the foregoing

is true and correct.

        Executed on this ⟨7⟩ day of March, 2006

                                Marilyn A. Dorn
                                Information Review Officer
                                National Clandestine Service
                                Central Intelligence Agency

11

*Waters v. CIA*, No. 1:06cv00383-RBW
Def.'s Opp'n Pl.'s Mot. Prelim. & Perm. Injs.
Ex. E

**Glass, David (CIV)**

| | |
|---|---|
| **From:** | ZaidMS@aol.com |
| **Sent:** | Friday, March 17, 2006 10:50 AM |
| **To:** | Glass, David (CIV) |
| **Cc:** | ZaidMS@aol.com |
| **Subject:** | Re: Waters: Draft Motion for Leave to File Documents on the Public Record |

**Attachments:**     tmp.htm



tmp.htm (2 KB)


In a message dated 3/17/2006 10:44:19 AM Eastern Standard Time, David.Glass@usdoj.gov
writes:

The   complaint says that the publication date is April 6.  In fact, is it April 20?


It was April 6th when the Complaint was filed, but that depended on a decision by March
10th, which obviously did not occur. Obviously as time passes  the publication date
continues to slip.

So, as of today, now the publication date is April 20th depending on a  March 23rd
resolution. You certainly have my consent to use this information if you wish to update
your filing.

Mark

---

This  electronic mail (e-mail) transmission is meant solely for the person(s) to whom  it
is addressed.  It contains confidential information that may also be  legally privileged.
Any copying, dissemination or distribution of the contents of this e-mail by anyone other
than the addressee or his or her agent for such purposes is strictly prohibited.  If you
have received this e-mail in error, please notify me immediately by telephone, facsimile
or e-mail and purge the original and all copies thereof.  Thank you.

Mark S. Zaid, Esq.
Krieger & Zaid,  PLLC
1920 N Street, N.W.
Suite 300
Washington, D.C. 20036
(202)  454-2809 direct
(202) 223-9050 main
(202) 293-4827  fax

*Waters v. CIA*, No. 1:06cv00383-RBW
Def.'s Opp'n Pl.'s Mot. Prelim. & Perm. Injs.
Ex. F

~~ADMINISTRATIVE - INTERNAL USE ONLY~~

**Date:** 07/22/2005

**Category:** ▮ - Public Affairs     **OPR:** ▮

**Title:** ▮▮▮   (U) AGENCY PREPUBLICATION REVIEW OF CERTAIN
MATERIAL PREPARED FOR PUBLIC DISSEMINATION



This regulation was written by ▮▮▮▮▮▮▮▮
▮▮▮.

## 2. AGENCY PREPUBLICATION REVIEW OF CERTAIN MATERIAL PREPARED FOR PUBLIC DISSEMINATION

**SYNOPSIS:** This regulation sets forth CIA polices and procedures for the submission
and review of material proposed for publication or public dissemination by current
and former employees and contractors and other individuals obligated by a CIA
secrecy agreement to protect from unauthorized disclosure certain information they
obtain as a result of their contact with the CIA. This regulation applies to all forms of
dissemination, whether in written, oral, electronic, or other forms, and whether
intended to be an official or nonofficial (that is, personal) publication.

## a. AUTHORITY

The National Security Act of 1947, as amended, the CIA Act of 1949, as amended, and Executive Order 12333 require the protection of intelligence sources and methods from unauthorized disclosure. Executive Order 12958, as amended, requires protection of classified information from unauthorized disclosure. 18 U.S.C. section 209 prohibits a federal employee from supplementation of salary from any source other than the U.S. Government as compensation for activities related to the employee's service as a Government employee. The *Standards of Ethical Conduct for Employees of the Executive Branch* (5 C.F.R. 2635) are the Government-wide ethics regulations that govern Federal employees. Those regulations include restrictions on outside activities and compensation for teaching, speaking, and writing related to official duties. In *Snepp v. U.S.*, 444 U.S. 507 (1980), the Supreme Court held that individuals who have been authorized access to CIA information the public disclosure of which could harm the national security hold positions of special trust and have fiduciary obligations to protect such information. These obligations are reflected in this regulation and in CIA secrecy agreements.

## b. GENERAL REQUIREMENTS AND DEFINITIONS

(1) The CIA requires all current and former Agency employees and contractors, and others who are obligated by CIA secrecy agreement, to submit for prepublication review to the CIA's Publications Review Board (PRB) all intelligence-related materials intended for publication or public dissemination, whether they will be communicated in writing, speeches, or any other method; and whether they are officially sanctioned or represent personal expressions, except as noted below.

(2) The purpose of prepublication review is to ensure that information damaging to the national security is not disclosed inadvertently; and, for current employees and contractors, to ensure that neither the author's performance of duties, the Agency's mission, nor the foreign relations or security of the U.S. are adversely affected by publication.

(3) The prepublication review requirement does not apply to material that is unrelated to intelligence, foreign relations, or CIA employment or contract matters (for example, material that relates to cooking, stamp collecting, sports, fraternal organizations, and so forth).

(4) Agency approval for publication of nonofficial, personal works (including those of current and former employees and contractors and covered non-Agency personnel) does not represent Agency endorsement or verification of, or agreement with, such works. Therefore, consistent with cover status, authors are required, unless waived in writing by the PRB, to publish the following disclaimer:

"All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official positions or views of the Central Intelligence Agency (CIA) or any other U.S. Government agency. Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information or CIA endorsement of the

author's views. This material has been reviewed by the CIA to prevent the disclosure of classified information."

(5) Those who are speaking in a nonofficial capacity must state at the beginning of their remarks or interview that their views do not necessarily reflect the official views of the CIA.

(6) A nonofficial or personal publication is a work by anyone who has signed a CIA secrecy agreement (including a current or former employee or contractor), who has prepared the work as a private individual and who is not acting in an official capacity for the Government.

(7) An official publication is a work by anyone who has signed a CIA secrecy agreement, (including a current employee or contractor), such as an article, monograph, or speech, that is intended to be unclassified and is prepared as part of their official duties as a Government employee or contractor acting in an official capacity.

(8) "Publication" or "public dissemination" in this context means:
   (a) for nonofficial (that is, personal) works — communicating information to one or more persons; and
   (b) for official works - communicating information in an unclassified manner where that information is intended, or is likely to be, disseminated to the public or the media.

(9) Covered non-Agency personnel means individuals who are obligated by a CIA secrecy agreement to protect from unauthorized disclosure certain information they obtain as a result of their contact with the CIA.

## c. THE PUBLICATIONS REVIEW BOARD

(1) The PRB is the Agency body charged with reviewing, coordinating, and formally approving in writing all proposed nonofficial, personal publications that are submitted for prepublication. It is also responsible for coordinating the official release of certain unclassified Agency information to the public. The Board consists of a Chair and an Executive Secretary -- designated by and reporting directly to the Chief, Information Management Services (IMS) – with the rest of the Board membership composed of senior representatives from the Director of CIA Area, the Directorate of Operations (DO), the Directorate of Support, the Directorate of Science and Technology, the Directorate of Intelligence, the Security Center, and the DO's Global Deployment Center, who are designated by the appropriate Deputy Director, or Operating Official with C/IMS concurrence. The Office of General Counsel (OGC) provides a nonvoting legal advisor.

(2) The PRB shall adopt and implement all lawful measures to prevent the publication of information that could damage the national security or foreign relations of the U.S. or adversely affect the CIA's functions or the author's performance of duties, and to ensure that individuals given access to classified information understand and comply with their contractual obligations not to disclose it. When the PRB reviews submissions that

involve the equities of any other agency, the PRB shall coordinate its review with the equity owning agency.

(3) The PRB Chair is authorized unilaterally to represent the Board when disclosure of submitted material so clearly would not harm national security that additional review is unnecessary or when time constraints or other unusual circumstances make it impractical or impossible to convene or consult with the Board. The Chair may also determine that the subject of the material is so narrow or technical that only certain Board members need to be consulted.



d. **CONTACTING THE PRB**

(1) <u>Former employees and contractors and other covered non-Agency personnel</u> must submit covered nonofficial (personal) materials intended for publication or public dissemination to the PRB by mail, fax, or electronically as follows:



(2) Current employees and contractors must submit covered nonofficial and official materials intended for publication or public dissemination to the PRB by mail, fax, or electronically as follows:

Internal Mail:
Classified Facsimile:
Email:
Secure Phone:



(3) Current employees and contractors intending to publish or speak on a nonofficial, personal basis must also complete and submit to the PRB an electronic cover memorandum identifying their immediate supervisor or contracting officer. The PRB will notify the appropriate Agency manager or contracting officer, whose concurrence is necessary for publication.

(4) Review Timelines. As a general rule, the PRB will complete prepublication review for nonofficial publications within 30 days of receipt of the material. Relatively short, time-sensitive submissions (for example, op-ed pieces, letters to the editor, and so forth) will be handled as expeditiously as practicable. Lengthy or complex submissions may require a longer period of time for review, especially if they involve intelligence sources and methods issues. Authors are strongly encouraged to submit drafts of completed works, rather than chapters or portions of such works.

## e.  WHAT IS COVERED

(1) Types of Materials. The prepublication review obligation applies to any written, oral, electronic, or other presentation intended for publication or public dissemination, whether personal or official, that mentions CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other contact with the Agency. The obligation includes, but is not limited to, works of fiction; books; newspaper columns; academic journal articles; magazine articles; resumes or biographical information on Agency employees (submission to the PRB is the exclusive procedure for obtaining approval of proposed resume text); draft *Studies in Intelligence* submissions (whenever the author is informed, by the *Studies* editor that the draft article is suitable for *Studies* Editorial Board review); letters to the editor; book reviews; pamphlets; scholarly papers; scripts; screenplays; Internet blogs, e-mails, or other writings; outlines of oral presentations; speeches; or testimony prepared for a Federal or state or local executive, legislative, judicial, or administrative entity; and Officers in Residence speeches and publications (although oral and written materials prepared by OIRs exclusively for their classroom instructional purposes are not covered, OIRs must take particular care to ensure that any anecdotes or other classroom discussions of their Agency experiences do not inadvertently reveal classified information). Materials created for submission to the Inspector General and/or the Congress under the Whistleblower Protection Act and CIA implementing regulations

are nonofficial, personal documents when they are initially created and the author is entitled to seek a review by the PRB to determine if the materials contain classified information and, if so, the appropriate level of classification of the information. If, at any point during or after the whistleblower process, the author wishes to disseminate his whistleblower complaint to the public, the author must submit his complaint to the PRB for full prepublication review under this regulation. If the author is a current employee or contractor who intends to disseminate his whistleblower complaint to the public, the author must also obtain PRB review of his materials under paragraph g below.

(2) Review of Draft Documents. Written materials of a nonofficial, personal nature covered by the regulation must be submitted to the PRB at each stage of their development before being circulated to publishers, editors, literary agents, coauthors, ghost writers, reviewers, or the public (that is, anyone who does not have the requisite clearance and need-to-know to see information that has not yet been reviewed, but may be classified). This prepublication review requirement is intended to prevent comparison of different versions of such material, which would reveal the items that the Agency has deleted. For this reason, PRB review of the material only after it has been submitted to publishers, reviewers, or other outside parties violates the author's prepublication review obligation. The Agency reserves the right to conduct a post-publication review of any such material in order to take necessary protective action to mitigate damage caused by such a disclosure. Such post-publication review and action does not preclude the U.S. Government or the CIA from exercising any other legal rights otherwise available as a result of this prepublication violation. Additionally, the Agency reserves the right to require the destruction or return to CIA of classified information found to have been included in earlier versions of a work regardless of the form of the media involved (for example, paper, floppy disk, hard disk, or other electronic storage methods).

(3) Public Presentations:

   (a) With respect to current and former employees and contractors and covered non-Agency personnel making intelligence-related speeches, media interviews, or testimony, they must submit all notes, outlines, or any tangible preparatory material to the PRB for review. Where no written material has been prepared specifically in contemplation of the speech, interview, or oral testimony, the individual must contact the PRB Chair or his representative to provide a summary of any and all topics that it is reasonable to assume may be discussed, and points that will or may be made. Unprepared or unrehearsed oral statements do not exempt an individual from possible criminal liability in the event they involve an unauthorized disclosure of classified information.

   (b) In addition, with respect to current employees and contractors making official or nonofficial oral intelligence-related statements to the media or to groups where the media will likely be in attendance, prior to granting interviews or making public appearances, the speaker shall contact the PRB for guidance. The PRB will coordinate the review of proposed speeches or media interviews with the component involved, the Office of Public Affairs for guidance regarding media or press relations, and other offices as necessary.

(c) <u>Current employees</u> who must make court appearances or respond to subpoenas must contact OGC for guidance.

(4) <u>Official Publications</u>. The publication or public dissemination of official Agency information by any means, including electronic transmissions, such as Internet and unclassified facsimile, is subject to prepublication review. In addition to the types of materials listed in paragraph e(1) above, official publications subject to this review include unclassified monographs; organizational charts; brochures; booklets; flyers; posters; advertisements; films; slides; videotapes; or other issuances, irrespective of physical media such as paper, film, magnetic, optical, or electronic, that mention CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other association with the Agency.



(6) <u>Additional PRB Guidance</u>. It is not possible to anticipate all questions that may arise about which materials require prepublication review. Therefore, it is the author's obligation to seek guidance from the PRB on all prepublication review issues not explicitly covered by this regulation.

## f. PREPUBLICATION REVIEW GUIDELINES FOR FORMER EMPLOYEES AND CONTRACTORS, AND COVERED NON-AGENCY PERSONNEL

(1) All material proposed for publication or public dissemination must be submitted to the PRB Chair, as described in paragraph d(1) above. The PRB Chair will have the responsibility for the review, coordination, and formal approval in writing of submissions in coordination with appropriate Board members.

(2) The PRB will review material proposed for publication or public dissemination solely to determine whether it contains any classified information. Permission to publish will not be denied solely because the material may be embarrassing to or critical of the Agency. Former employees, contractors, or non-Agency personnel must obtain the written approval of the PRB prior to publication.

(3) When it is contemplated that a co-author who has not signed a CIA secrecy agreement will contribute to a publication subject to prepublication review, the final version of the publication must clearly identify those portions of the publication that were authored by the individual subject to the secrecy agreement. Where there is any ambiguity concerning which individual wrote a section, and the section was not submitted for review, the Agency reserves the right to consider the section to be entirely written by the individual subject to the secrecy agreement and therefore in violation of the individual's prepublication review obligations.

(4) When otherwise classified information is also available independently in open sources and can be cited by the author, the PRB will consider that fact in making its determination on whether that information may be published with the appropriate citations. Nevertheless, the Agency retains the right to disallow certain open-source information or citations where, because of the author's Agency affiliation or position, the reference might confirm the classified content.





**h. APPEALS**

(1) If the PRB denies all or part of a proposed nonofficial publication, the author may submit additional material in support of publication and request reconsideration by the PRB. In the event the PRB denies the request for reconsideration, the author may appeal. PRB decisions involving nonofficial publications may be appealed to the Executive Director (EXDIR) within 30 days of the decision. Such an appeal must be in writing and must be sent to the PRB Chair. Appeal documentation must include the material intended for publication and any supporting materials the appealing party wishes the EXDIR to consider. The PRB Chair will forward the appeal and relevant documentation through the components that objected to publication of the writing or other product at issue. The Deputy Director or Head of Independent Office will affirm or recommend revision of the

decision affecting his or her component's equities and will forward that recommendation to OGC. OGC will review the recommendations for legal sufficiency and will make a recommendation to the EXDIR for a final Agency decision. The PRB Chair is responsible for staff support to the EXDIR. The EXDIR will render a written final decision on the appeal. Best efforts will be made to complete the appeal process within 30 days from the date the appeal is submitted.

(2) This regulation is intended to provide direction and guidance for those persons who have prepublication review obligations and those who review material submitted for nonofficial or official publication. Nothing contained in this regulation or in any practice or procedure that implements this regulation is intended to confer, or does confer, any substantive or procedural right or privilege on any person or organization beyond that expressly stated herein.

## i. BREACH OF SECRECY AGREEMENT

Failure to comply with prepublication review obligations can result in the imposition of civil penalties or damages. When the PRB becomes aware of a potential violation of a CIA secrecy agreement, it will notify OGC and the Security Center. After Security Center review and investigation of the case is completed, if further action is deemed warranted, the Security Center will refer the matter to OGC, which will report all potentially criminal conduct to the Department of Justice (DoJ) and consult with DoJ regarding any civil remedies that may be pursued.

/s/
Porter J. Goss
Director of the Central Intelligence Agency